David Martinez, State Bar No. 193183
DMartinez@RobinsKaplan.com
**ROBINS KAPLAN LLP**
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone: 310-552-0130
Facsimile: 310-229-5800

Tara Sutton *(pro hac vice to be submitted)*
TSutton@RobinsKaplan.com
Gary Wilson, State Bar No. 139358
GWilson@RobinsKaplan.com
Philip Sieff *(pro hac vice to be submitted)*
PSieff@RobinsKaplan.com
Jason DePauw *(pro hac vice to be submitted)*
JDePauw@RobinsKaplan.com
Rashanda Bruce *(pro hac vice to be submitted)*
RBruce@RobinsKaplan.com
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN  55402
Telephone: 612-349-8500
Facsimile: 612-339-4181

*Attorneys for Plaintiffs*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN KELLEY and ROBIN KELLEY, Individually, and as Personal Representatives and General Co-Administrators of THE ESTATE OF J.K., their minor child, deceased;<br><br>J.O., a minor, Individually, and as Successor-in-Interest to THE ESTATE OF H.H., deceased, and as Successor-in-Interest to THE ESTATE OF SARA SCHNEIDER, deceased, by and through his Guardian ad Litem, JUDY SCHNEIDER,<br><br>                Plaintiffs,<br><br>    v.<br><br>AW DISTRIBUTING, INC.; AW PRODUCT SALES & MARKETING, INC.; AW & HO (HOLDINGS), INC.; KENNIC HO; ALICE HO; WALMART INC.; WAL-MART STORES, INC.; WAL-MART STORES EAST, LP; WAL-MART STORES EAST, LLC; AND JOHN DOE COMPANY DEFENDANTS #1–10,<br><br>                Defendants. | Case No. 3:20-cv-06942<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **WRONGFUL DEATH**<br>2. **STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN**<br>3. **STRICT PRODUCTS LIABILITY –MANUFACTURING DEFECT**<br>4. **STRICT PRODUCTS LIABILITY – FAILURE TO WARN**<br>5. **NEGLIGENCE**<br>6. **BREACH OF EXPRESS WARRANTY**<br>7. **BREACH OF IMPLIED WARRANTY**<br>8. **UNFAIR BUSINESS PRACTICES**<br>9. **FALSE ADVERTISING**<br>10. **PUBLIC NUISANCE**<br>11. **SURVIVAL ACTION**<br>12. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS** |

**JURY TRIAL DEMAND**

Plaintiffs, BRIAN KELLEY and ROBIN KELLEY, Individually, and as Personal Representatives and General Co-Administrators of THE ESTATE OF J.K., their minor child, deceased; and Plaintiff, J.O., a minor, Individually, and as Successor-in-Interest to THE ESTATE OF H.H, deceased minor, and as Successor-in-Interest to THE ESTATE OF SARA SCHNEIDER, deceased, by and through his Guardian ad Litem, JUDY SCHNEIDER (collectively, "Plaintiffs") by way of Complaint against Defendants bring this action and allege as follows:

**INTRODUCTION**

1.      Inhalant abuse has been known and prevalent in the United States for decades. Many common household products are used to get high because they are cheap and easily accessible, such as aerosols, glue, cleaning fluids, and gasoline, as examples.

2.      One type of inhalant that people commonly abuse to get high is computer dust remover sprays.  These products are compressed gas in a can that are used to spray off dust and debris from whatever surface is being cleaned.  However, they contain a gas—difluoroethane—that, if inhaled, causes the person to lose consciousness and control of their bodily movements nearly immediately.

3.      These dust removers are cheap and available at retail locations throughout the United States, meaning anyone with a few dollars can purchase the product to get high.  Dust removers are popular among inhalant abusers, so much so that the companies who design, manufacture, distribute, and sell these products profit greatly as a result.  Manufacturers, distributors, and sellers of dust removers—such as AW Distributing, Inc., AW Product Sales & Marketing, Inc., AW& HO (Holdings), Inc., Kennic Ho, Alice Ho, Walmart Inc., Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, and Wal-Mart Stores East, LLC (collectively "Defendants")—know, and have known at all times material, that people inhale their dust removers to get high.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

4.     Dust remover abuse comes at a terrible price for many innocent bystanders.  Because dust remover is so cheap, highly accessible, and produces such a quick and powerful high, people abuse them nearly anywhere, including while driving.  When someone gets high on dust remover while driving, they can quickly lose consciousness or control of their bodily movements and crash their vehicle, often resulting in catastrophic and deadly results.

5.     There have been numerous public reports of injuries and deaths to innocent bystanders caused by people driving while high on dust removers stretching back for at least twenty years.  The manufacturers, distributors, and sellers of these dust removers are fully aware of these predictable and foreseeable injuries and deaths.  Every one of these injuries and deaths was preventable, yet the manufacturers, distributors, and sellers of these dust removers—like Defendants—have failed to deter or prevent people from inhaling their dust removers.

6.     Several people in particular whose injuries and deaths were foreseeable and preventable were children who were members of Girl Scouts Troop 3055 and a parent of one of those children, in Chippewa Falls, Wisconsin.  On November 3, 2018, J.K, H.H., and Sara Schneider were part of a group of Girl Scouts and parents who were volunteering to clean litter from the side of a highway. At the same time the Girl Scouts volunteer group was picking up the trash from the grass on the side of the highway, a man named Colten Treu was driving his motor vehicle while high on Defendants' Ultra Duster dust remover on the same highway.  Predictably and foreseeably, Colten Treu drove off the highway while high on Ultra Duster and struck many of the Girl Scouts volunteer group.  The collision resulted in many deaths, including the deaths of J.K., H.H., and Sara Schneider.  These individuals' tragic injuries and deaths would have been avoided altogether if Defendants had not negligently and defectively designed, manufactured, distributed, and sold Ultra Duster, knowing it was reasonably foreseeable that someone would inhale Ultra Duster to get high while driving and strike and harm and kill innocent bystanders like J.K., H.H., and Sara Schneider.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**PARTIES, JURISDICTION AND VENUE**

**The Kelley Family**

7.     J.K. died on November 3, 2018 after being struck and grievously injured by the same vehicle driven by Colten Treu in the Village of Lake Hallie, Chippewa County, Wisconsin.  At the time of J.K.'s death, she was nine years old, having been born in 2009.  J.K. was living in Chippewa Falls, Chippewa County, Wisconsin, with her married parents Brian Kelley and Robin Kelley, and with her sister.

8.     Brian Kelley is J.K.'s surviving father who resides in Chippewa Falls, Wisconsin. On November 3, 2018, Brian Kelley was present for, was in the zone of danger, and witnessed J.K.'s serious injuries that resulted in her death after J.K. was struck by the motor vehicle.

9.     Robin Kelley is J.K.'s surviving mother who resides in Chippewa Falls, Wisconsin. On November 3, 2018, Robin Kelley was present for, was in the zone of danger, and witnessed J.K.'s serious injuries that resulted in her death when J.K. was struck by the motor vehicle.

10.     Brian Kelley and Robin Kelley were J.K.'s parents and natural guardians at the time of her death.

11.     Brian Kelley and Robin Kelley are the Personal Representatives for the Estate of J.K., having been conferred authority to administer J.K.'s Estate and having been conferred authority to litigate on behalf of J.K.'s Estate, by and through the laws of the State of Wisconsin and by and through Orders issued by the Circuit Court of Chippewa County, Probate Registrar, of the State of Wisconsin, on April 30, 2020, granting Brian Kelley and Robin Kelley Letters Domiciliary of Informal Administration as Personal Representatives of J.K.'s Estate. The Orders granting Brian Kelley and Robin Kelley Domiciliary Letters of Informal Administration as Personal Representatives of J.K.'s Estate are collectively attached hereto as **Exhibit 1.**

12.     Brian Kelley and Robin Kelley are suing in their individual capacities and as Personal Representatives and General Co-Administrators of J.K.'s Estate, and on behalf of the survivors and beneficiaries entitled to make claims as set forth herein and as prescribed by law, including, for claims of wrongful death and survivorship.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Sara Schneider's Family**

13.     H.H. died on November 3, 2018 after being struck and grievously injured by the vehicle driven by Colten Treu in the Village of Lake Hallie, Chippewa County, Wisconsin. At the time of H.H.'s death, she was 10 years old, having been born in 2008.  H.H. was living in Chippewa Falls, Chippewa County, Wisconsin, with her younger brother, J.O., her mother, Sara Schneider, and her maternal grandmother, Judy Schneider.   H.H.'s mother, Sara Schneider, was also volunteering with the Girl Scouts volunteer group to clean the roadside litter, and Sara Schneider was also struck and killed by the vehicle operated by Colten Treu.  At the time of their deaths, Sara Schneider was H.H.'s sole living parent and natural guardian.  H.H.'s natural father is deceased and had been deceased prior to the date of H.H.'s and Sara Schneider's deaths.

14.     Sara Schneider also died on November 3, 2018 after being struck and grievously injured by the vehicle operated by Colten Treu. At the time of Sara Schneider's death, she was 32 years old, having been born in 1986.  Sara Schneider was living in Chippewa Falls, Chippewa County, Wisconsin, with her daughter, H.H., her son, J.O., and her mother, Judy Schneider.  At the time of their deaths, Sara Schneider was H.H.'s mother and natural guardian.

15.     J.O. is the surviving biological brother of H.H. and is the surviving biological son of Sara Schneider.  J.O. resides in Cary, Illinois.

16.     Judy Schneider is the surviving biological grandmother of J.O. and H.H., and is the surviving biological mother of Sara Schneider.   Judy Schneider resides in Chippewa Falls, Wisconsin.

17.     J.O. is represented by his biological grandmother Judy Schneider as Guardian ad Litem, and/or Judy Schneider will apply to this Court for appointment as Guardian ad Litem at or near the filing of this Complaint.

18.     J.O., a minor, is suing Individually, and as Successor-in-Interest to H.H.'s Estate, and as Successor-in-Interest to Sara Schneider's Estate, and is suing on behalf of the survivors and beneficiaries entitled to make claims as set forth herein and as prescribed by law, including, for claims of wrongful death and survivorship concerning both the Estate of H.H. and the Estate of Sara Schneider, by and through his Guardian ad Litem, Judy Schneider.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**The Defendants**

19.     Defendant AW DISTRIBUTING, INC. ("AW Distributing") is a California registered Corporation with its principal place of business located at 13411 Andy Street, Cerritos, California 90703, 1180 Hayne Road, Hillsborough, California, 94010, and 204 E. 2nd Avenue #343, San Mateo, California 94401.

20.     Defendant AW PRODUCT SALES & MARKETING, INC. ("AW Product Sales") is a California registered Corporation with its principal place of business located at 13411 Andy Street, Cerritos, California 90703, 1180 Hayne Road, Hillsborough, California 94010, and 204 E. 2nd Avenue #343, San Mateo, California 94401.

21.     Defendant AW & HO (HOLDINGS), INC. ("AW Holdings") is a California registered Corporation with its principal place of business located at 13411 Andy Street, Cerritos, California 90703 and 1180 Hayne Road, Hillsborough, California 94010.   (Defendants AW Distributing, AW Product Sales, and AW Holdings are collectively referred to as the "AW Corporate Defendants").

22.     Defendants KENNIC HO and ALICE HO are individuals who, upon information and belief, reside at 1180 Hayne Road, Hillsborough, California 94010 and 13411 Andy Street, Cerritos, California 90703 (collectively, the "AW Individual Defendants").   Kennic Ho is a shareholder, Director, President, manager, and registered agent of AW Distributing, Inc.; co-owner, Chief Executive Officer, and registered agent of AW Product Sales & Marketing, Inc.; and co-owner, Director, Chief Executive Officer, Secretary, Chief Financial Officer, and registered agent of AW & HO (Holdings), Inc.   Alice Ho is a co-owner, Director, Chief Executive Officer, Secretary, and Chief Financial Officer of AW Distributing, Inc.; co-owner, Director, Chief Executive Officer, Secretary, and Chief Financial Officer of AW Product Sales & Marketing, Inc.; and co-owner of AW & HO (Holdings), Inc.

23.     At all relevant times, upon information and belief, the AW Corporate Defendants and the AW Individual Defendants (collectively, the "AW Defendants") have been directly and/or indirectly engaged in the designing, testing, producing, processing, assembling, formulating, inspecting, researching, promoting, labeling, marketing, advertising, distributing, and selling of

Ultra Duster for ultimate sale and use throughout the United States, including within the State of California.

24.     Further, upon information and belief, the AW Defendants knowingly and willfully participated in and/or facilitated the distribution and sale of millions of Ultra Duster cans in and from the State of California over at least the last decade.

25.     In so doing, through their words, conduct or otherwise, the AW Defendants combined their property, skill and/or knowledge in furtherance of a joint venture.  Further, the AW Defendants acted with and contributed to a mutual understanding, common purpose, and joint ownership and interest in the joint enterprise, and each had the right to share in its profits and losses and to a voice in the direction and control of the means to carry out such common purpose and agreement.

26.     Each AW Defendant acted as an agent, employee, co-conspirator, alter ego and/or joint venturer of the other AW Defendants, within the course and scope and in furtherance of such agency, employment, alter ego, joint venture and joint enterprise, and with the permission and consent of the other AW Defendants.

27.     At all relevant times, upon information and belief, there has existed, a unity of interest and ownership amongst the AW Defendants.  For example, the AW Corporate Defendants at all relevant times shared the same corporate address offices and/or business locations, and the same ownership, management, employees, and officers, and they failed to observe corporate formalities, failed to properly capitalize, failed to generate and keep corporate records and failed to maintain adequate insurance.

28.     Moreover, upon information and belief, the AW Individual Defendants at all times were the sole shareholders of the other AW Defendants and controlled, dominated, managed, and operated the other AW Defendants as their alter egos, engaged in co-mingling of assets, and failed to observe distinctions between personal and corporate funds.  Further, the AW Defendants used Defendant AW Holding as a shell company designed to shield corporate assets of the other AW Defendants, including the Individual Defendants' $9,270,000 residence.

29.     Upon information and belief, the AW Defendants have moved assets amongst them, including multiple transfers to AW Holdings, in order to avoid liability and defraud creditors, including the liabilities alleged in this Complaint and others related to Ultra Duster.  For example, Daiho Sangyo, Inc., the foreign distributor of Ultra Duster, sued AW Distributing for breach of contract in 2018 as a result of AW Distributing's alleged failure to pay Daiho Sangyo for shipments of Ultra Duster it sent to AW Distributing.  That litigation was resolved by way of a settlement agreement.  Despite not being named parties to the lawsuit, however, the AW Individual Defendants each agreed to be personally liable for AW Distributing's debts owed to Daiho Sangyo.[1]

30.     In other recent litigation, defendant Kennic Ho submitted a sworn declaration on behalf of and authorized by all of the AW Corporate Defendants.  In that declaration, Defendant Kennic Ho states that the AW Corporate Defendants' "principal places of business are located at 13411 Andy Street, Cerritos, California 90703 and 204 E. 2nd Avenue #343, San Mateo, California 94401," and that the AW Corporate Defendants jointly operate a warehouse in California for the purpose of distributing Ultra Duster cans to retailers.

31.     As such, the separateness of the AW Defendants has ceased to exist and adherence to the fiction of the separate existence of these entities would sanction a fraud, promote injustice and/or bring about inequitable results.

32.     Defendant WALMART INC. is a Delaware corporation with its principal place of business located in Bentonville, Arkansas.  Walmart Inc. owns and operates many retail stores within the state of California and is registered to do business and receive service of process in California.  WAL-MART STORES, INC. formally changed its name to Walmart Inc. in 2018. Defendant WAL-MART STORES EAST, LP is a Delaware limited partnership with its principal place of business located in Bentonville, Arkansas.  Defendant WAL-MART STORES EAST, LLC is a Delaware limited liability corporation with its principal place of business located in Bentonville, Arkansas.  Upon information and belief, Wal-Mart Stores East, LP and Wal-Mart

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[1] Notice of Settlement, Request for Continuing Jurisdiction and Stipulation for Entry of Judgment Upon Any Default, *Daiho Sangyo, Inc. v. AW Distributing, Inc.*, No. 18-CIV-05244 (Ca. Sup. Ct. June 30, 2020).

Stores East, LLC are subsidiaries of Walmart Inc.  (Walmart Inc. and any of its affiliates, subsidiaries, successors or assigns, including Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, Wal-Mart Stores East, LLC are referred to collectively as "Walmart").  At all material and relevant times, Walmart was involved in the designing, testing, producing, processing, assembling, formulating, inspecting, researching, promoting, labeling, marketing, advertising, distributing, and selling of Ultra Duster for ultimate sale and use throughout the United States.

33.     John Doe Company Defendants #1–10, whose specific identities are currently unknown to Plaintiffs, are the individuals, business entities, and corporations within the chain of commerce that sold, distributed, designed, and/or manufactured Ultra Duster for marketing, sale, and distribution into the stream of commerce to Colten R. Treu and other consumers and users. The pseudonymous designations are being used to preserve claims against these parties who will be named more fully if and when their identities are discovered.

34.     At all material and relevant times, the AW Defendants and Walmart (collectively "Defendants") were all active and knowing participants in the chain of commerce that resulted in the designing, manufacturing, distributing, selling, and purchasing of Ultra Duster that resulted in the deaths of J.K., H.H., and Sara Schneider.  At all material and relevant times, all Defendants exercised significant control over the designing, manufacturing, distributing, selling, and purchasing of Ultra Duster.

## **Jurisdiction & Venue**

35.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Plaintiffs and Defendants, and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest, costs and disbursements.

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 18 U.S.C. § 1965 because all Defendants reside in this district and/or maintain significant contacts in this district, maintain a registered agent for service of process in this district, and do business in this district, including the sale, marketing, promotion and distribution of Ultra Duster, the product relevant to this action.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **FACTS**

### **INHALANT ABUSE**

37.     Inhalant abuse has been a public health issue in the United States for many years and continues to this day.[2]

38.     Inhalant abuse is the deliberate inhaling or sniffing of common products found in homes and schools to get high.[3]

39.     Inhalants include a variety of products, such as nitrous oxide, cleaning fluids, aerosols, gasoline, and spray paint.[4]

40.     Inhalants are known to be abused for their intoxicating effects because they are often cheap, easily accessible, and easy to conceal.[5]

41.     Numerous organizations and governmental entities dedicate resources to raising awareness of inhalant abuse, such as the National Institute on Drug Abuse, Substance Abuse and Mental Health Services Administration, and American Addiction Centers.

42.     The National Institute on Drug Abuse has stated that the number of inhalant-related deaths in the United States was approximately 100-200 people per year as of July, 2012.[6]

---

[2] National Institute on Drug Abuse, *Review of Inhalants: Euphoria to Dysfunction* (Oct. 1977), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.152.2815&rep=rep1&type=pdf#page=23.
[3] United States Consumer Product Safety Commission, *A Parent's Guide to Preventing Inhalant Abuse: "Inhalant Abuse: It's Deadly. Inhalant Abuse Can Kill,"* https://www.cpsc.gov/safety-education/safety-guides/containers-and-packaging/parents-guide-preventing-inhalant-abuse (last visited Apr. 27, 2020).
[4] Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health.* https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf (last visited Apr. 27, 2020).
[5] Carrie E. Anderson, M.D. & Glenn A. Loomis, M.D., *Recognition and Prevention of Inhalant Abuse,* American Family Physician, (Sep. 1, 2003), https://www.aafp.org/afp/2003/0901/p869.html.
[6] National Institute on Drug Abuse, *Inhalants: What are the Medical Consequences of Inhalant Abuse?*, https://www.drugabuse.gov/publications/research-reports/inhalants/what-are-other-medical-consequences-inhalant-abuse (last updated July 2012).

43.     In 2018, the National Survey on Drug Use and Health reported that approximately two million people over 12 years old have used inhalants in the past.[7]

44.     American Addiction Centers refers to inhalant abuse as "the forgotten drug epidemic."[8]

45.     According to Sara Stickler, Executive Director of the Alliance for Consumer Education, inhalant-related deaths are vastly underreported: "You're looking in the hundreds probably, annually, just from the alerts and the cases we are able to track on our own.  But there's probably many, many more that are being recorded as something else."[9]

## COMPRESSED GAS DUSTING SPRAYS

46.     One particular category of inhalants that are known to be abused for their intoxicating effects is compressed gas dusting sprays.[10]

47.     Compressed gas dusting sprays are often referred to in many different ways, including "keyboard cleaner," "electronics cleaner," "computer cleaner," "dusting spray," "canned air," "compressed gas cleaner," "compressed gas duster," as examples.  For purposes of this Complaint, this category of products will be referred to as "dust remover" or "dust removers."

48.     Dust removers typically share similar characteristics, both physically and chemically.

---

[7] Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health.* https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf (last visited Apr. 27, 2020).

[8] American Addiction Centers, *The Dangers of Inhalants,* https://americanaddictioncenters.org/inhalant-abuse (last updated June 10, 2019).

[9] Carter Sherman, *Inhalants — The Easy to Acquire but Deadly Drug That Nobody Talks About*, Houston Press (September 6, 2016), https://www.houstonpress.com/news/inhalants-the-easy-to-acquire-but-deadly-drug-that-nobody-talks-about-8730670.

[10] Substance Abuse and Mental Health Services Administration, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health*, https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf (last visited Apr. 27, 2020).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

49. Dust removers are physically similar in that they are sold in a handheld can that is topped by a spray nozzle and an actuator trigger that opens a valve to release a pressurized stream of pressurized gas through and out the spray nozzle.

50. Dust removers are nearly identical in appearance and function, which is to spray a highly pressurized gas out of the can to clear a surface of dust and debris.

51. Defendants, for example, at all material and relevant times and upon information and belief, designed, manufactured, tested, labeled, distributed, and/or sold a dust remover called Ultra Duster.



52. At all material and relevant times, the function of Ultra Duster was similar to other dust removers on the market, which was to "blast dust, dirt, and unwanted micro-articles away from computers, keyboards, printers plus many more."[11]

53. At all material and relevant times, Defendants advertised and marketed Ultra Duster as a "compressed gas air duster" that "blast[s] dust, dirt, and unwanted micro-articles away from computers, keyboards, printers plus many more."[12]

---

[11] AW Distributing, Inc., *Ultra Duster Product Description,* http://www.awdus.com/products_01_01.html.
[12] AW Distributing, Inc., *Ultra Duster Product Description,*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

54.     The primary function of a similar product, 3M Dust Remover, according to its manufacturer, is to "Remove[] Dust & Lint in Home or Office."[13]  3M Dust Remover is marketed as a "Compressed Gas Duster."



---

http://www.awdus.com/products_01_01.html.

[13] 3M Company, *3M Dust Remover Label*,
http://www.3m.com/us/office/advisory/Artwork3MDustRemoverApprovedOctober2008.pdf.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

55.     The primary function of another similar product, Dust-Off branded dust remover, according to its manufacturer, is to "provide potent dust-removing power for practically any task. Use in your office space to clean keyboards, CPU, laptop, or desk area.  Great for removing dust around the home like window blinds, collectibles, sewing machines, holiday ornaments, craft projects and silk flower arrangements."[14]



[14] Falcon Safety Products, Inc., *Dust-Off Product Description*, https://falconsafety.com/shop/dusters/disposable/disposable-duster-10-oz/.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

56.   The primary function of a similar product, CRC Duster, according to its manufacturer, is to "provide[] a powerful blast of product to remove embedded debris without damaging sensitive components or surface finishes."[15]



57.   Dust removers are chemically similar in that they typically contain a pressurized volatile, fluorinated hydrocarbon gas called 1-1, difluoroethane (hereinafter "difluoroethane" or "DFE").[16]

58.   DFE is used in many consumer products—such as deodorants, hair spray, mousse, air fresheners, disinfectants, household cleaners, and automotive cleaners and waxes—as an aerosol propellant or foaming agent to propel the main product out of its container or create the foaming properties of certain products.[17]

---

[15] CRC Industries, Inc., *CRC Duster Product Description,* https://www.crcindustries.com/products/duster-8482-moisture-free-dust-lint-remover-8-wt-oz-05185.html.
[16] Falcon Safety Products, Inc., *Dust-Off Compressed Gas Duster Safety Data Sheet,* https://falconsafety.com/wp-content/uploads/SDS_dust-off-compressed-gas-duster.pdf.
[17] National Center for Biotechnology Information, PubChem Database, 1,1-Difluoroethane, CID=6368, https://pubchem.ncbi.nlm.nih.gov/compound/1%2C1-difluoroethane#section=Use-and-Manufacturing (last visited Apr. 27, 2020).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

59. Because DFE is a central nervous system depressant, when inhaled, it causes debilitating and impairing effects such as unconsciousness, drowsiness, dizziness, and suffocation.[18]

60. Inhaling products that contain DFE can also cause paralysis, which partially or completely interferes with a person's ability to move normally or control their bodily movements.[19]

61. The impairing effects of inhaling products containing DFE commonly result in dizziness, loss of inhibitions, inability to make sound decisions, and slurred speech.[20]

62. When inhaled, DFE can also cause death by cardiac arrest.[21]

63. As early as 1936, scientists began testing fluorinated hydrocarbons as a potential surgical anesthesia because of their analgesic effects.[22]

64. Researchers continued their research into the anesthetic properties of fluorinated hydrocarbons in 1960, specifically testing DFE on dogs and human volunteers.[23]

65. The volunteer human testers inhaled the DFE and "noted good analgesia and impending loss of consciousness."[24]

---

[18] International Programme on Chemical Safety,  Internationally Peer Reviewed Chemical Safety Information, 1,1-Difluoroethane, ISCS: 1729 (March 2009), http://www.inchem.org/documents/icsc/icsc/eics1729.htm; Novotny, Clara B et al., "Acute Psychosis Following 1,1-Difluoroethane Inhalation," *Cureus* vol. 11,9 e5565, Sep. 4, 2019, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6820689/; Alexis L. Cates and Matthew D. Cook, "Severe Cardiomyopathy after Huffing Dust-Off," *Case Reports in Emergency Medicine*, vol. 2016, Article ID 9204790 (2016), https://www.hindawi.com/journals/criem/2016/9204790/#B2.

[19] American Addiction Centers, *Huffing Canned Air or Dust-Off: Side Effects, Signs, and More.* https://americanaddictioncenters.org/inhalant-abuse/side-effects (last updated Jun. 17, 2019).

[20] *Id.*

[21] Avella, Joseph, et al., "Fatal Cardiac Arrhythmia After Repeated Exposure to 1,1-Difluoroethane (DFE)," *The American Journal of Forensic Medicine and Pathology.* 27(1):58-60 (March 2006), https://www.ncbi.nlm.nih.gov/pubmed/16501351 [abstract].

[22] Harold Booth & May E. Bixby, "Fluorine Derivatives of Chloroform," *Industrial and Engineering Chemistry*, 24(6):637-41 (June 1932), https://pubs.acs.org/doi/pdf/10.1021/ie50270a012 [first page].

[23] Alan Poznak and Joseph F. Artusio, Jr., "Anesthetic Properties of a Series of Fluorinated Compounds: I. Fluorinated Hydrocarbons," *Toxicology and Applied Pharmacology*, vol. 2(4):363-73 (July 1960), https://www.sciencedirect.com/science/article/pii/0041008X60900028 [abstract].

[24] *Id.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

66.     While the DFE exhibited good anesthetic properties, researchers eliminated DFE as a possible surgical anesthetic because of its explosive properties.[25]

67.     According to the American Addiction Centers, inhaling DFE also causes immediate psychoactive, intoxicating-like side effects, such as a rush of euphoria, hallucinations, and delusions.[26]

68.     Because of these effects, DFE is, and has been at all material and relevant times, a popular substance of abuse.[27]

69.     In fact, reports started surfacing in the 1960s of teenagers dying after inhaling volatile hydrocarbons similar to DFE.[28]

70.     DFE use can lead to addiction, which is a form of Substance Abuse Disorder.[29]

71.     Reports of people getting hurt, dying, and killing and injuring others after inhaling products containing DFE, such as dust removers, continue to this day.

## DUST REMOVER ABUSE

72.     Predictably and foreseeably, when a person intentionally inhales a dust remover containing DFE that person frequently exhibits some or all of the aforementioned adverse health effects along with the sought-after intoxicating, psychoactive side effects.

73.     Reports of dust remover abuse in the public domain are numerous and easily accessible, for example by a simple online search of widely available public media, like newspapers.

74.     Reports of people getting high on dust remover, driving, and causing harm and death to others are also numerous, easily accessible, and in the public domain.

---

[25] *Id.*
[26] American Addiction Centers, *Huffing Canned Air or Dust-Off: Side Effects, Signs, and More.* https://americanaddictioncenters.org/inhalant-abuse/side-effects (last updated Jun. 17, 2019).
[27] Regina Liu & Thomas Blair, MD, *Skeletal Fluorosis and "Sniffer's Dermatitis" After Inhalant Abuse with 1,1-Difluroethane*, *Proceedings of UCLA Health*, vol. 23 (2019), https://www.proceedings.med.ucla.edu/wp-content/uploads/2019/03/Liu-A190213RL-BLM-edited.pdf.
[28] *Id.*
[29] National Institute on Drug Abuse, *Inhalants: What are Inhalants?*, https://www.drugabuse.gov/publications/drugfacts/inhalants (last updated April 2020).

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

75.     Governmental agencies, organizations, researchers, and media from around the country have compiled data and reported on people intentionally inhaling propellants, including dust removers since at least the 1990s.

76.     It is clear, and has been clear at all material and relevant times, that people have been abusing dust removers to get high and continue to do so to this day.

77.     It is clear, and has been clear at all material and relevant times, that people will drive while high on dust removers.

78.     It is clear, and has been clear at all material and relevant times, that people will cause injuries and death to innocent bystanders while driving high on dust removers.

79.     Researchers have reported that while inhalant abuse—such as sniffing gasoline or paint—in general has been in decline over time since 1993, propellant abuse—such as intentionally inhaling dust remover—specifically increased starting around 1998 and started to skyrocket around 2003:[30]



---

[30] Melinda R. Marsolek, et al., *Inhalant Abuse: Monitoring Trends by Using Poison Control Data, 1993-2008*, Pediatrics, 125(5) 906-913 (May 2010), https://pediatrics.aappublications.org/content/125/5/906#T1.

80.     This same study calculated that dust remover comprised about 57% of all propellant abuse during this same time frame.[31]

81.     In 1997, a woman struck and catastrophically injured another driver when the woman lost control of her vehicle after getting high on dust remover while driving.[32]

82.     In 1997, researchers published a case report of two individuals who died when their vehicle crashed after the driver got high from inhaling a can of propellant containing DFE.[33]

83.     In 1999, five high school juniors in Pennsylvania were killed when the driver ran her vehicle off the side of the road and struck a tree after getting high on dust remover; three of the passengers were also reported to have DFE in their system.[34]

84.     Almost exactly two years later in 2001, a Pennsylvania teenager died when she veered off the road and crashed her vehicle after she got high from dust remover.[35]

85.     In June of 2001, a teenager in Indianapolis died after getting high on dust remover in a swimming pool, where he drowned when his heart stopped.[36]

86.     The United States Consumer Product Safety Commission operates an injury surveillance system known as the National Electronic Injury Surveillance System ("NEISS"). The purpose of the NEISS is to collect and publish data on consumer product-related injuries occurring in the United States, including aerosol inhalant-related injuries, by cataloging some emergency room visits from 1997-2010.[37]

---

[31] *Id.*

[32] Craig Peters, *Woman Submits Plea in Huffing Crash*, GoUpstate.com (Sep. 12, 2008), https://www.goupstate.com/news/20080912/woman-submits-plea-in-huffing-crash.

[33] LA Broussard, et al., *Two Traffic Fatalities Related to the Use of Difluoroethane*, J. Forensic Sci.,42(6):1186–7 (Nov. 1997), https://www.ncbi.nlm.nih.gov/pubmed/9397568 [abstract].

[34] Michael Janofsky, *Fatal Crash Reveals Inhalants as Danger to Youth*, N.Y. Times (Mar. 2, 1999), https://www.nytimes.com/1999/03/02/us/fatal-crash-reveals-inhalants-as-danger-to-youth.html.

[35] Katrina Macleod, *Coroner Says Inhalant Use Led to Fatality*, Daily Local News (Feb. 24, 2001), https://www.dailylocal.com/news/coroner-says-inhalant-use-led-to-fatality/article_76cc60a8-1de0-5aa7-94c5-43dd18fb828d.html.

[36] *Car Crash at Regatta Draws Attention to Inhalant Use*, Madison Courier (July 25, 2006), https://madisoncourier.com/Content/News/News/Article/Car-crash-at-Regatta-draws-attention-to-inhalant-use/178/961/31258.

[37] National Electronic Injury Surveillance System, *Accidents-Aerosol Containers-Years 1997-*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

87. The NEISS's first record of a computer duster-specific injury is 2002:

| | | | |
|---|---|---|---|
| **Date:** 01/22/2002 | **Age:** 14 years | **Sex:** Male | **Race:** White |
| **Location:** Not recorded | | **Fire:** No fire involvement or fire involvement not recorded | |
| **Body part:** All Of Body | | **Diagnosis:** Poisoning | |
| **Product:** Aerosol containers | | | |

14 YOM INHALED AEROSOL "PERFECT DUSTER ' STATES " I NEEDED TO GET HIGH; PCC CONTACTED

**Disposition:** Treated and transferred to another hospital

88. There are dozens of reports of dust remover abuse clearly identified in the NEISS from 2002–2010.[38]

89. In 2004, researchers published a research article reviewing the death of a person associated with inhaling dust removers.[39]

90. In 2005, Today.com alerted its readers to the increasing danger of "dusting," or inhaling dust remover after several children were killed after getting high on dust remover in separate incidents.[40]

91. In 2006, a woman died after getting high on 3M Dust Remover that she purchased from Walmart.[41]

92. In 2006, researchers published a research article reviewing the death of a person associated with getting high on dust removers and other products containing DFE.[42]

---

*2010-All of Body*,
http://www.hospital-data.com/accidents/1133-aerosol-containers/all-of-body/index.html (last visited Apr. 27, 2020).
[38] *Id.*
[39] Z. Xiong, et al., *Sudden Death Caused by 1,1-difluoroethane Inhalation*, J. Forensic Sci., 49(3):627-9 (May 2004),
https://www.ncbi.nlm.nih.gov/pubmed/15171188 [abstract].
[40] Peter Alexander, *"Dusting" is the New Killer High for Teens*, Today (Jul. 26, 2005),
https://www.today.com/parents/dusting-new-killer-high-teens-2D80555302.
[41] *Wal-Mart, 3M Sued in Teenager's Death from Solvent*, Reuters (May 31, 2007),
https://www.reuters.com/article/us-walmart-huffinglawsuit/wal-mart-3m-sued-in-teenagers-death-from-solvent-idUSN3122706820070531.
[42] Avella, Joseph, et al., *Fatal Cardiac Arrhythmia After Repeated Exposure to 1,1-Difluoroethane (DFE)*, The American Journal of Forensic Medicine and Pathology, 27(1):58-60 (March 2006),
https://www.ncbi.nlm.nih.gov/pubmed/16501351 [abstract].

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

93.     In 2006, researchers published a case report of an individual who had crashed her vehicle and died after getting high on dust remover.[43]  According to the article, the trunk of the car contained approximately forty cans of dust remover, including CRC Duster-branded dust remover.

94.     In 2006, a California TV news channel aired a special report on the dangers of huffing dust removers, focusing on the deaths of three teenagers who were believed to have been high on dust remover when their car crashed.[44]

95.     In 2007, a man was killed as he was walking in a parking lot when he was struck by a vehicle driven by a woman who was high on 3M Dust Remover-branded dust remover.[45]

96.     In 2007, a Nebraska man crashed his vehicle into a tree after getting high on 3M Dust Remover-branded dust remover.[46]

97.     In 2012, researchers published a case report identifying 17 deaths involving DFE at the San Diego County Medical Examiner's Office from 2007-2011.[47]  Among those 17 reports of death involving DFE, "Case 3" identified the death of a 50-year-old male in a car crash.  Witnesses who saw the crash described the man as traveling approximately 65 mph when he "veered to the right across lanes, onto the shoulder, and down a steep embankment, overturning the vehicle many times."  An intact can containing DFE was found among the crash debris.

98.     In 2008, an Oklahoma man was arrested on charges of public intoxication after getting high on 3M Dust Remover-branded dust remover; the police found more than 200 cans of dust remover in the man's vehicle.[48]

_____

[43] T. Hahn, et al., *A Motor Vehicle Accident Fatality Involving the Inhalation of 1,1-Difluoroethane*, J. Analytical Toxicology, vol. 30(8):638-42 (Oct. 2006), https://www.ncbi.nlm.nih.gov/pubmed/17132266 [abstract].
[44] KCRA3, *Huffing and Teens*, YouTube (Jun. 17, 2011), https://www.youtube.com/watch?v=b03ZSk8g40U.
[45] *Downing v. City of Dothan*, 59 So. 3d 16 (Ala. 2010), https://caselaw.findlaw.com/al-supreme-court/1539446.html.
[46] Sarah Schulz, *Teen Who Ran Over Police Officer Involved in Second Accident*, The Grand Island Independent, (Jan. 18, 2007), https://www.theindependent.com/news/teen-who-ran-over-police-officer-involved-in-second-accident/article_e545b1c0-af76-5a21-8062-935e80b0c920.html.
[47] Vance, Chris, et al., *Deaths Involving 1,1-Difluoroethane at the San Diego County Medical Examiner's Office*, Journal of Analytical Toxicology, Vol. 36(9):626-33 (Nov./Dec. 2012), https://academic.oup.com/jat/article/36/9/626/784617.
[48] *12-11 Crime Briefs*, The Edmond Sun (Dec. 10, 2008),

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

99.     In 2008, researchers published a case report of an individual who had crashed his vehicle after getting high on dust remover.[49]

100.    In 2009, a Nebraska man was found unresponsive in his vehicle after getting high on 3M Dust Remover-branded dust remover.[50]

101.    In 2009, an Ohio teenager died when she crashed her car after getting high on dust remover that she purchased at Walmart.[51]

102.    In 2009, a Pennsylvania woman veered off the road after she got high on dust remover and struck and killed a teenager and seriously injured another teenager who were walking on a sidewalk.[52]

103.    In 2009, a case study analyzed the death of a man who died after getting high on dust remover.[53]

104.    In 2009, a man in Wyoming was found guilty of aggravated vehicular homicide stemming from charges that he killed someone when he passed out while driving and high on dust remover.[54]

105.    In 2010, a man in Pennsylvania got high on dust remover he purchased at a local Walmart, veered into oncoming traffic, and struck and killed a music teacher.[55]

---

https://www.edmondsun.com/news/local_news/crime-briefs/article_a7286710-e3da-51d4-b733-111878ece7e5.html (last visited Jan. 7, 2020).
[49] Little, Jill, et al., *Inhalant Abuse of 1,1-Difluoroethane (DFE) Leading to Heterotopic Ossification: A Case Report*, Patient Safety in Surgery, vol. 2(1):28, (Oct. 2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2584001/.
[50] *Talmage Man Arrested for Huffing in Hospital Garage*, Lincoln Journal Star (Aug. 11, 2009), https://journalstar.com/news/local/crime-and-courts/talmage-man-arrested-for-huffing-in-hospital-garage/article_172e2f0c-86af-11de-8056-001cc4c03286.html.
[51] *Teen Admits Huffing Before Fatal Crash*, 21WFMJ (Aug. 24, 2009), https://www.wfmj.com/story/10951585/teen-admits-huffing-before-fatal-crash.
[52] William Bender, *Cops: "Huffing" Cause of Fatal Delco Crash*, The Philadelphia Inquirer (Sep. 10, 2009), https://www.inquirer.com/philly/hp/news_update/20090910_Cops___Huffing___cause_of_fatal_Delco_crash.html.
[53] C. Sasaki, T. Shinozuka, *A Fatality Due to Inhalation of 1,1-Difluoroethane (HFC-152a) With a Peculiar Device*, Forensic Toxicology 27:45 (2009), https://link.springer.com/article/10.1007/s11419-008-0065-7.
[54] William Browning, *Casper Man Faces Felony DUI*, Billings Gazette (Apr. 18, 2011), https://billingsgazette.com/news/state-and-regional/wyoming/casper-man-faces-felony-dui/article_44842e90-1c24-5c11-bc49-4030c05dfd34.html.
[55] Jason Nark, *Cops: Man Did Drugs Before Crash that Killed Teacher*, The Philadelphia Inquirer

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

106.    In 2010, an Illinois teenager killed the passenger in his vehicle when he crashed after getting high on dust remover.[56]

107.    In 2010, the American Journal of Drug and Alcohol Abuse warned that dust remover abuse by adolescents was becoming a public health threat.[57]

108.    In 2010, a TV news station aired a report on several teenagers who crashed a car after getting high on dust removers, including 3M Dust Remover-branded dust remover.[58]

109.    A video uploaded to YouTube.com on November 27, 2010 shows at least one person inhaling dust remover while sitting in a parked car.[59]

110.    In 2011, a man in Wyoming was reported to have crashed his vehicle after getting high on dust remover.[60]

111.    Two days later, yet another man in Wyoming was reported to have crashed his vehicle after getting high on dust remover he purchased at a local Walmart beforehand.[61]

112.    A video posted to YouTube.com in 2011 shows a young man getting high on dust remover while sitting in the driver's seat of a vehicle.[62]

---

(Oct. 12, 2010),
https://www.inquirer.com/philly/hp/news_update/20101013_Cops__Man_did_drugs_before_crash_that_killed_teacher.html.
[56] Dave Haney, *Teen Gets Prison for Fatal Crash*, Peoria Journal Star (Aug. 20, 2011), https://www.pjstar.com/article/20110820/NEWS/308209911.
[57] Eric Garland, & Matthew Howard, *Inhalation of Computer Duster Spray Among Adolescents: An Emerging Public Health Threat?*, The American Journal of Drug and Alcohol Abuse, vol.36(6):320-24 (Jul. 21, 2010),
https://www.tandfonline.com/doi/full/10.3109/00952990.2010.504874 [abstract].
[58] 40/29 News, *Police Say Teens High on Duster*, YouTube (Sep. 3, 2010), https://www.youtube.com/watch?v=K1hNUrWuYKo.
[59] @shurrden, *Bella Inhaling Dust Remover*, YouTube (Nov. 27, 2010), https://www.youtube.com/watch?v=7kRttfMkSro.
[60] William Browning, *Casper Man Faces Felony DUI*, Billings Gazette (Apr. 18, 2011), https://billingsgazette.com/news/state-and-regional/wyoming/casper-man-faces-felony-dui/article_44842e90-1c24-5c11-bc49-4030c05dfd34.html.
[61] *19-Year Old Faces DUI Charge After Allegedly Huffing*, Casper Star Tribune (Apr. 20, 2011), https://trib.com/news/local/casper/year-old-faces-dui-charge-after-allegedly-huffing/article_33bd9038-2683-5537-9ba4-9ac8d3e5ca19.html.
[62] @swifferkillsdogs, *Jimmy Huffing Dust Remover*, YouTube (Dec. 14, 2011), https://www.youtube.com/watch?v=FjlazUNE2-8.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

113.   Another video posted to YouTube.com in 2011 shows a young man getting high on dust remover while sitting in the driver's seat of a vehicle.  The young man shares the can of dust remover with his passengers, who also inhale from the can.[63]

114.   In 2011, an Illinois man crashed his vehicle after getting high on dust remover, killing three of his passengers.[64]

115.   In 2011, a California woman crashed her vehicle after getting high on 3M Dust Remover-branded dust remover.[65]

116.   In 2011, researchers published a research article reviewing three deaths associated with inhaling dust removers.[66]

117.   In two videos posted to YouTube.com in 2011, several young men are shown getting high on dust remover in the woods; the resulting debilitating and mind-altering effects visibly present.[67]

118.   In 2012, researchers published a research article reviewing the death of a person associated with inhaling dust removers.[68]

119.   In February of 2012, a woman struck and seriously injured two men who were standing in their own driveway after the woman lost control of her vehicle when she got high on dust remover.[69]

---

[63] @allenpalin, *Doing Duster at Whataburger*, YouTube (Dec. 26, 2011), https://www.youtube.com/watch?v=GYRQN-7raLM&has_verified=1.
[64] *People v. Blakey*, 44 N.E.3d 1186 (Ill. App. Ct. 2015). https://caselaw.findlaw.com/il-court-of-appeals/1719505.html.
[65] Melissa Pinion-Whitt, *Madd to Honor Rialto Police Officer*, Los Angeles Daily News (Mar. 11, 2011, updated Aug. 28, 2017), https://www.dailynews.com/2011/03/11/madd-to-honor-rialto-police-officer/.
[66] C. Sasaki, T. Shinozuka, *A Fatality Due to Inhalation of 1,1-Difluoroethane (HFC-152a) With a Peculiar Device*, Forensic Toxicology, 27:45 (2009), https://www.ncbi.nlm.nih.gov/pubmed/20875935 [abstract].
[67] @theicedub, *Duster Trip Part 1*, YouTube (Apr. 29, 2011), https://www.youtube.com/watch?v=4yR9MJl3OQk; @theicedub, *Duster Trip Part 2*, YouTube (Apr. 29, 2011), https://www.youtube.com/watch?v=xdbH2PXS2kU.
[68] PC Kurniali, et al., *Inhalant Abuse of Computer Cleaner Manifested as Angioedema*, American Journal of Emergency Medicine, 30(1): 265e3-5 (Jan. 2012), https://www.ncbi.nlm.nih.gov/pubmed/21295430 [abstract].
[69] Julius Whigham II, *Woman, 19, Charged with DUI in Delray Beach Crash that Injured Two; Accused of "Huffing" Aerosol Can*, The Palm Beach Post (Oct. 23, 2012),

120.    A woman was convicted of third-degree murder in Pennsylvania after she huffed dust remover she purchased at a local Walmart before she struck and killed another driver in August of 2012.[70]

121.    In September 2012, a Vermont man struck and killed a teenager who was walking to her father's car after the man lost control of his vehicle when he got high on dust remover.[71]

122.    In October 2012, a man crossed the median and struck and killed two siblings after getting high on dust remover.[72]

123.    In 2012, a woman was charged with reckless homicide after local authorities said she struck and killed a five-year-old girl while driving high on dust remover.[73]

124.    In 2012, a TV station aired a story featuring a teenager who lost consciousness and caused a multi-vehicle crash after she got high on dust remover while driving.[74]

125.    In 2013, researchers published a case study of a man who suffered from acute renal failure after inhaling twenty cans of Defendants' Ultra Duster-branded dust remover in twenty hours.[75]

126.    In 2014, a TV news station reported a twenty-one-year-old had died after huffing dust remover.[76]

---

https://www.palmbeachpost.com/article/20121023/NEWS/812023237.
[70] Steve Bauer, *Judge Rejects New Trial in Fatal Huffing Case*, StateCollege.com (June 10, 2015), http://www.statecollege.com/news/local-news/judge-rejects-new-trial-in-fatal-huffing-case,1464214/.
[71] Brent Curtis, *Man Guilty of Manslaughter in Crash While "Huffing,"* Times Argus Online (Jan. 17, 2015), https://www.timesargus.com/news/man-guilty-of-manslaughter-in-crash-while-huffing/article_f72d7085-c65c-5b5a-9420-dc234b33b782.html.
[72] *Man Sentenced for Crash that Killed Ole Miss Siblings*, WMC5 Action News (Sept. 23, 2013, updated June 30, 2013), https://www.wmcactionnews5.com/story/23505970/man-sentenced-for-crash-that-killed-ole-miss-siblings/.
[73] *Suit: "Huffing" Teen Driver May Have Run Over Girl Twice*, CBS Chicago (Sep. 20, 2012), https://chicago.cbslocal.com/2012/09/20/suit-huffing-teen-driver-may-have-run-over-girl-5-twice/.
[74] Wood TV8, *Driver on "Duster" Causes 3-Car Crash*, YouTube (Dec. 13, 2012), https://www.youtube.com/watch?v=sDpnX0m7a8E.
[75] Danxuan Long et al. "A Case of Ultra Duster Intoxication Causing Acute Renal Failure," CHEST, Volume 144, Issue 4, 290A (Oct. 29, 2013), https://journal.chestnet.org/article/S0012-3692(16)42923-5/fulltext.
[76] ABC 17 News, *21-Year-Old Dies from Inhaling Air Duster Can*, YouTube (Nov. 11, 2014), https://www.youtube.com/watch?v=ePXED7E4-sw&feature=youtu.be.

127.    In 2014, law enforcement in Greenwich, New York were prompted to warn the public of the dangers associated with huffing after a man was hospitalized for inhaling dust removers.[77]

128.    In 2014, a woman suffered near-fatal injuries in Maine when local authorities alleged she crashed her car after getting high on dust remover.[78]

129.    In 2014, local authorities in Texas charged a man with a felony when he was alleged to have crashed his car after getting high on dust remover, injuring himself and his passenger.[79]

130.    In 2015, a woman was arrested after local authorities found her huffing Defendants' Ultra Duster product at Walmart.[80]

131.    In 2016, researchers published a research article reviewing the death of a person associated with inhaling dust removers.[81]

132.    In 2016, researchers published a research article reviewing the death of another person associated with inhaling dust removers.[82]

133.    In 2017, a driver struck and fatally killed three Minnesota men who were traveling to a cabin for the weekend after the driver huffed Defendants' Ultra Duster product.[83]

---

[77] *Spread of "Huffing" Feared*, The Post Star (June 2, 2014), https://poststar.com/news/local/spread-of-huffing-feared/article_287eac5e-ea9c-11e3-a0bf-001a4bcf887a.html.
[78] Erica Thoms, *Driver in Near-Fatal Belfast Crash Charged with Abuse of Inhalants* (May 14, 2014), https://www.penbaypilot.com/article/driver-near-fatal-belfast-crash-charged-abuse-inhalants/33406.
[79] *MPD: Man Inhales Air Duster, Injures Passenger in Crash*, MRT.com (Jun. 2, 2014), https://www.mrt.com/crime/article/MPD-Man-inhales-air-duster-injures-passenger-in-7411373.php.
[80] *ULTRA DUSTED: Woman Huffing Canned Air Arrested*, HuffPost (Sep. 1, 2015), https://www.huffpost.com/entry/woman-accused-of-huffing-canned-air-at-big-box-store_n_55e5d01ae4b0c818f6193149.
[81] S. Kumar, et al., *Cardiomyopathy from 1,1-Difluoroethane Inhalation*, Cardiovascular Toxicology 16, 370-73 (Nov. 2015), https://link.springer.com/article/10.1007%2Fs12012-015-9348-5 [abstract].
[82] Alexis L. Cates and Matthew D. Cook, *Severe Cardiomyopathy after Huffing Dust-Off*, Case Reports in Emergency Medicine, vol. 2016, Article ID 9204790 (2016), https://www.hindawi.com/journals/criem/2016/9204790/.
[83] *Kendhammer, et al. v. AW Distributing, Inc., et al.*, Case No. 20-cv-01539-NEB-TNL (D. Minn.); FOX 9, *Impaired, wrong-way driver in court for deaths of three cabin-bound Minnesota men*, (Aug. 9, 2017), https://www.fox9.com/news/impaired-wrong-way-driver-in-court-for-deaths-of-three-cabin-bound-minnesota-men.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

134.    In 2017, a Minnesota mother and daughter suffered severe injuries when a driver crashed his vehicle after getting high on Defendants' Ultra Duster product.[84]

135.    A video posted to YouTube.com in 2017 shows a woman sitting in the driver side of her car immediately after crashing her car and then continuing to huff from a can of dust remover.[85]

136.    In a particularly disturbing video posted to YouTube.com in 2017, a young man inhales dust remover while sitting in the driver's seat of his truck and parked in a parking lot.  The video demonstrates the immediate, debilitating effects of inhaling dust remover.[86]

137.    In 2018, a man was killed after being struck head on by another driver who was driving his vehicle while high on Falcon Safety Products' Dust-Off product.[87]

138.    In 2019, researchers published a case study of a woman who suffered from acute psychosis after inhaling a dust remover.[88]

139.    In 2019, a Minnesota woman was struck and killed by a driver who had been huffing CRC Duster-branded dust remover.[89]

140.    In 2019, a researcher published an article about "[s]udden sniffing death" which can occur when an individual inhales dust remover—"an inexpensive easily accessible product[]."[90]

---

[84] *Chairez v. AW Distributing, Inc., et al.*, Case No. 20-cv-01473-NEB-TNL (D. Minn.); Justin Labounty, *Four Hurt, One With Life Threatening Injuries In Sherburne Crash*, WJON.com, (Dec. 7, 2017) https://wjon.com/four-hurt-one-with-life-threatening-injuries-in-sherburne-crash/.

[85] @RoadCam, *Woman Inhaling Gas Duster Caused a Crash*, YouTube (Nov. 27, 2017), https://www.youtube.com/watch?v=YJrroAChIW4.

[86] @Diamondmytegaming, *Air Duster in a McDonald's Parking Lot*, YouTube (Oct. 2, 2017), https://www.youtube.com/watch?v=Wt-3JF1tgM0.

[87] *Silvestry v. Falcon Safety Products*, Case No. ESX-L-003103-20 (Sup. Ct. NJ.); Brian Lock, *Savannah Man Facing Manslaughter Charge Over Deadly St. Joseph Wreck*, (June 28, 2018), https://www.kmzu.com/savannah-man-facing-manslaughter-charge-over-deadly-st-joseph-wreck/.

[88] Clara B. Novotny, et al. "Acute Psychosis Following 1,1-Difluoroethane Inhalation," *Cureus* vol. 11(9) e5565 (Sep. 4 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6820689/.

[89] *McDougall v. CRC Industries, Inc.*, Case No. 20-CV-1499-JRT-LIB (D. Minn.); Lakeland PBS, *One Dead After Crash In Lake Of The Woods County*, (Jul. 23, 2019) https://lptv.org/one-dead-after-crash-in-lake-of-the-woods-county/.

[90] Kathy Prybys, DO, "Sudden Sniffing Death," University of Maryland School of Medicine, Department of Emergency Medicine, https://umem.org/educational_pearls/3622/ (last updated Jul. 5, 2019).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

141.   On May 28, 2020, a Wisconsin man struck and killed an eighteen-year-old girl who was walking after the man lost control of his vehicle when he got high on dust remover.[91]

142.   On June 1, 2020, researchers published a case study of a man who suffered from significant cardiomyocyte damage after inhaling multiple cans of Dust-Off-branded dust remover on a daily basis for one month.[92]

143.   And in popular culture, dust remover abuse has been portrayed on film and TV and entertainment personalities have fallen victim to the intoxicating and addicting effects of dust removers.

144.   In the movie *Thirteen*, released in 2003, two characters are portrayed getting high on dust remover.[93]

145.   On August 11, 2008, in Season 4, Episode 19 of the TV show *Intervention* which follows people who work to overcome—and recover from—their drug addictions, the show focused on a young woman who was addicted to getting high off dust removers.[94]

146.   In Season 14, Episode 7 of the TV show *South Park* that aired on April 28, 2010, the show portrayed one of the characters with a drug addiction and was depicted getting high on dust remover while sitting in a car.[95]

---

[91] Fox WZAW, *Court docs: Texting was a factor in fatal Adams County hit-and-run,* (May 28, 2020) https://www.wsaw.com/content/news/Court-docs-Texting-huffing-factors-in-fatal-Adams-County-hit-and-run-570840431.html?ref=431.

[92] Cao A. Shiliang, et al., "Air Duster Inhalant Abuse Causing Non-ST Elevation Myocardial Infarction," Cureus 12(6): e8402 doi:10.7759/cureus.8402 (Jun. 1, 2020), https://www.cureus.com/articles/26124-air-duster-inhalant-abuse-causing-non-st-elevation-myocardial-infarction.

[93] Alexandru Cojanu, *Inhalant Abuse: The Wolf in Sheep's Clothing*, American Journal of Psychiatry Residents' Journal (Feb. 2018), https://psychiatryonline.org/doi/pdf/10.1176/appi.ajp-rj.2018.130203.

[94] A&E, *Intervention: Allison*, S4 E19 (Aug. 11, 2008), https://play.aetv.com/shows/intervention/season-4/episode-19.

[95] @trilabyte700, *Towelie Inhaling 2000 Cans of Computer Air Duster a Day*, YouTube (Feb. 16, 2012), https://www.youtube.com/watch?v=wfXzHDY5Lrc.

147.   In 2017, Aaron Carter, a popular singer, crashed his car after his friends called 911 multiple times to report Carter had been huffing dust remover all night, Carter had been driving all night, and that Carter was a danger on the road as a result.[96]

148.   On June 23, 2020, Brandon Hall, an actor prominently known for his role in the 1994 movie *Little Rascals,* was arrested for huffing dust remover after local authorities responded to a hotel's call about a possible overdose.[97]

### **DEFENDANTS' ULTRA DUSTER**

149.   Defendants, at all material and relevant times and upon information and belief, designed, manufactured, tested, labeled, distributed, and/or sold a dust remover called Ultra Duster.



150.   At all material and relevant times, the function of Ultra Duster was similar to other dust removers containing DFE on the market.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[96] *Aaron Carter: "He's Inhaling Computer Duster" Says Friend in 911 Call (Audio)*, TheBlast (Sep. 21, 2017, updated June 10, 2019), https://theblast.com/c/aaron-carter-computer-duster-911-call.
[97] US Weekly, *'Little Rascals' Star Bug Hall Arrested for Allegedly Huffing Air Duster: See the Mugshot,* (Jun. 23, 2020) https://www.usmagazine.com/celebrity-news/news/little-rascals-bug-hall-arrested-for-allegedly-huffing-see-his-mugshot/.

151.    At all material and relevant times, Defendants advertised and marketed Ultra Duster as a "compressed gas air duster" that "blast[s] dust, dirt, and unwanted micro-articles away from computers, keyboards, printers plus many more."[98]

152.    At all material and relevant times, the appearance of Ultra Duster was substantially similar to other dust remover products on the market:



153.    At all material and relevant times, the main ingredient in Ultra Duster—like other compressed gas dusters on the market—was DFE:[99]

**SECTION 3.  COMPOSITION/INFORMATION ON INGREDIENTS**

| Ingredients | CAS # | % TLV PEL UNITS |
|---|---|---|
| 1,1-Difluoroethane | 75-37-6 | 100 |
| Contains: Bitterant | | |

---

[98] AW Distributing, Inc., *Ultra Duster Product Description,* http://www.awdus.com/products_01_01.html.

[99] AW Distributing, Inc., *Ultra Duster Safety Data Sheet,* http://awdus.com/MSDS01.HTML.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    154.    At all material and relevant times, DFE was the main ingredient in Ultra Duster

2 because the sole purpose of this product is to propel a pressurized burst of gas from the can at a

3 high velocity to displace dust and other material from the surface of whatever item is being cleaned.

**Human Health Effects:**
Contact with the liquid may cause frostbite. Overexposure by inhalation may include nonspecific discomfort, such as nausea, headache, or weakness; or temporary nervous system depression with anesthetic effects such as dizziness, headache, confusion, incoordination and loss of consciousness. Higher exposures (>20%) may cause temporary lung irritation effects with cough, discomfort, difficulty breathing, or shortness of breath; or temporary alteration of the heart's electrical activity with irregular pulse, palpitations, or inadequate circulation, abnormal kidney function as detected by laboratory tests. Gross overexposure may be fatal. Individual with preexisting diseases of the central nervous or cardiovascular system may have increased susceptibility to the toxicity of excessive exposures.

9    155.    At all material and relevant times, the Material Safety Data Sheet that Defendants

10 published online for Ultra Duster acknowledges the severe Central Nervous System effects of

11 inhaling DFE:[100]

12   156.    Because the DFE in Ultra Duster causes psychoactive effects when inhaled, many

13 people intentionally inhale Ultra Duster to get high.[101]

14   157.    At all material and relevant times, Defendants knew that people intentionally

15 inhaled Ultra Duster to get high.

16   158.    At all material and relevant times, Defendants knew that people intentionally

17 inhaled Ultra Duster to get high while driving and subsequently harm or kill innocent bystanders.

18   159.    In fact, a civil lawsuit was commenced against multiple defendants—including AW

19 Distributing and Walmart—in 2012 when two Florida residents were seriously injured earlier in

20 that year after being struck by a woman who was high on Ultra Duster dust remover while

21 driving.[102]   A copy of that Complaint is attached hereto as **Exhibit 2.**   Joe Bussell testified as the

22 Corporate Representative of Walmart on October 22, 2015.   A copy of his deposition transcript is

23

24 [100] AW Distributing, Inc., *Ultra Duster Safety Data Sheet,* http://awdus.com/MSDS01.HTML.
25 [101] National Institute on Drug Abuse, *Inhalants: Letter from the Director*, https://www.drugabuse.gov/publications/research-reports/inhalants/letter-director.
26 [102] Complaint, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Nov. 20, 2012) (attached hereto as **Exhibit 2);** Deposition Transcript of Joe Bussell ("Bussell Dep.") (attached hereto as **Exhibit 3),** *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015); Deposition Transcript of Kennic Ho ("Ho Dep.") (attached hereto as **Exhibit 4),** *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

attached hereto as **Exhibit 3**.  Kennic Ho testified on behalf of AW Distributing on February 15, 2016.  A copy of his deposition transcript is attached hereto as **Exhibit 4.**

160.    According to Kennic Ho, who testified that he was AW Distributing's Manager, AW Distributing—and Kennic Ho personally—are aware that people inhale Ultra Duster to get high, and that people "abuse[] it":[103]

```
14       Q.    Are you aware that people inhale Ultra Duster
15   to get high?
16            MR. WARING:  Object to the form.
17            THE WITNESS:  I know someone -- I know people
18   abused it.
```

161.    According to Joe Bussell, Walmart's Corporate Representative, Walmart is also aware that people inhale Ultra Duster to get high, and that people "abuse[] it":[104]

```
9        Walmart is aware that consumers of canned air
10   purchased in it's stores often buy it to inhale it and get
11   high.  Right?
12            MR. WOOD:  Objection.  Argumentative.
13            MR. SANTIAGO:  Object to the form.
14            MR. WOOD:  Asked answered, and move to
15   strike.
16   A.    Again, Walmart is aware that customers have
17   purchased the product and misused it or abused it, in the
18   past, yes.
```

[103] Ho Dep. 28:10–18, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).
[104] Bussell Dep. 36:9–18, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

162.    According to Kennic Ho, AW Distributing has known that people intentionally inhale dust remover products containing difluoroethane since before Ultra Duster started being sold: [105]

```
 7              Have you ever heard of anybody inhaling Ultra
 8     Dust?
 9              MR. WARING:  Object to form.
10              THE WITNESS:  Yes.
11     BY MR. KOLTON:
12        Q.    Where did you first hear about that?
13              MR. WARING:  Object to form.
14              THE WITNESS:  I don't remember what year.
15     BY MR. KOLTON:
16        Q.    Was it before Ultra Duster started being sold?
17              MR. WARING:  Object to form.
18              THE WITNESS:  Maybe.
19                    Probably, yes.
```

---

[105] Ho Dep. 29:7–19, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

163.    In fact, Kennic Ho testified under oath that he was aware that people misused and abused Ultra Duster since at least May 2010: [106]

```
 5        Q.    What type of misuse and abuse were you hoping
 6   to impact?
 7              MR. WARING:  Object to form.
 8              THE WITNESS:  Other than legal uses, all kind
 9   of different -- all kind of other uses are abuse.
10   BY MR. KOLTON:
11        Q.    Would that include inhalation of Ultra Duster?
12              MR. WARING:  Object to form.
13              THE WITNESS:  Of course.
14   BY MR. KOLTON:
15        Q.    So you knew that people inhaled Ultra Duster
16   back in May of 2010?
17              MR. WARING:  Object to form.
18              THE WITNESS:  Can you repeat timeframe,
19   please.
20   BY MR. KOLTON:
21        Q.    Sure.
22              Back in May 2010, when you wrote this E-mail,
23   you knew that people inhaled computer duster products
24   such as Ultra Duster?
25        A.    Yes.
```

---

[106] Ho Dep. 104:5–25, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

164.   Joe Bussell similarly testified under oath that Walmart was aware that people have been misusing and abusing Ultra Duster since at least 2008: [107]

```
11  Q.    So Walmart was aware people were actually huffing in
12  their stores and passing out in 2008; right?
13  A.    Yes.  Again, those types of incidents are what led
14  us to request that there was a bittering agent in the
15  products.
```

165.   Walmart Knows that people have misused and abused Ultra Duster and similar dust removers in Walmart stores and parking lots: [108]

```
12  Q.    (Mr. Cornwell continued.)  Well, let me read it into
13  the record.  "Deputies say Jones huffed an aerosol
14  computer cleaner for several hours before the car he was
15  driving struck Starnes in a crosswalk, then hit a parked
16  truck and a tree."  Do you see that?
17  A.    Yes.
18  Q.    It goes on to say that "huffing led Jones to lose
19  consciousness, which he didn't regain until the air bag
20  deployed, deputies said."  Okay?
21  A.    It says that, yes.
22  Q.    Yeah.  Is this an incident that Walmart would be
23  aware of since it occurred in their parking lot?
24  A.    Our asset protection team would be aware of it since
25  it occurred in the parking lot, yes.
```

---

[107] Bussell Dep. 148:11–15, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).
[108] Bussell Dep. 121:12–25, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).  *See also id.* at 116:11–117:6, 120:16–121:21, 125:15–126:9, 144:5–17, 147:2–13, 149:3–25, 151:24–153:10, 155:6–156:3, 157:15–158:1, 159:16–160:23, 161:1–12, 162:22–163:13, 166:14–23, 176:25–177:9, 178:23–179:10, 186:13–187:1, 193:6–24, 199:25–200:15, 201:3–18, 202:4–16, 203:3–204:2, and 204:13–23.

COMPLAINT

166.   At all material and relevant times, the product label for Ultra Duster contained a general notice to the user of the product that "misuse by deliberately concentrating and inhaling contents may be harmful or fatal":



167.   At all material and relevant times, AW Distributing published a website http://www.ultraduster.com/ ("Ultra Duster Website") which states "ULTRA DUSTER contains a bitterant additive that discourages potential abusive and misusage of the product by making its contents unpleasant to inhale." [109]

168.   At all material and relevant times, the Ultra Duster Website published a notice that Ultra Duster "now comes with an additive known as bitterant, making the contents extremely

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[109] Ultra Duster, *Bitterant*, http://www.ultraduster.com/bitterant.html.

unpleasant to inhale." The informational notice contains a website link to provide users and potential users of Ultra Duster information on inhalant abuse at https://inhalant-abuse.net/:[110]

**INHALANT ABUSE**
Ultra Duster aka Canned Air, Gas Duster, Compressed Gas Duster
Each can now comes with an additive known as bitterant, making the contents extremely unpleasant to inhale.

169.    At all material and relevant times, the Ultra Duster Bitterant Webpage only advised visitors of the website of the potential for inhalant abuse.

170.    At all material and relevant times, the Ultra Duster Bitterant Webpage provided no warnings that inhaling Ultra Duster can cause harm or death to innocent bystanders, including the foreseeable and predictable risk that a person could lose control of their vehicle and strike and injure or kill another person when high on Ultra Duster.

171.    At all material and relevant times, Defendants provided inadequate warnings to the user of the product about the potential for harm that the user and innocent bystanders may experience as a result of inhaling Ultra Duster.

172.    At all material and relevant times, Defendants provided no warnings that inhaling Ultra Duster can cause harm or death to innocent bystanders, including the foreseeable and predictable risk that a person could lose control of their vehicle and strike and injure or kill another person when high on Ultra Duster.[111]

173.    At all material and relevant times, and upon information and belief, Defendants never warned people who are, or who could be, exposed to Ultra Duster that they should not operate a motor vehicle.[112]

---

[110] Ultra Duster, *Bitterant*, http://www.ultraduster.com/bitterant.html.
[111] AW Distributing, Inc., *Website generally*, http://www.awdus.com/
[112] AW Distributing, Inc., *Website generally*, http://www.awdus.com/

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

174.   According to Kennic Ho, a bitterant ("bitterant" or "bittering agent") has been present in Ultra Duster since Ultra Duster was first distributed in the United States: [113]

> 9     Q.     Did Wal-Mart ever direct AW Distributing to
> 10    add a bitterant to Ultra Duster?
> 11    A.     If I didn't remember wrong, our product from
> 12    the first day that it was imported to America already
> 13    have bitterant added to it.

175.   At all material and relevant times, the product label for Ultra Duster advertised that Ultra Duster "[c]ontains a bitterant to help discourage inhalant abuse": [114]



176.   The advertised bittering agent, in fact, did not effectively discourage or prevent people from inhaling Ultra Duster to get high.

177.   At all material and relevant times and upon information and belief, Defendants had no intention of actually discouraging abuse of Ultra Duster as an inhalant as Defendants continued to sell Ultra Duster in a form that continued to be inhaled by persons seeking to get high.

178.   At all material and relevant times and upon information and belief, Defendants only advertised the existence of a "bittering agent" because certain retailers, such as Walmart, would not sell the product without such an advertisement on the label.

---

[113] Ho Dep. 104:5–25, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).
[114] Sam's Club, *Ultra Duster Label*, https://www.samsclub.com/p/ultra-duster-compressed-gas-4pk-canned-air/prod22700731

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

179.    According to Joe Bussell, Walmart required AW Distributing "to include a bitterant in their [Ultra Duster] supplied to Walmart": [115]

```
3   Q.    So -- and my question was poor.  Let me back up.
4   Beginning in 2011, Walmart required all suppliers of
5   canned air, including AWD, to include a bitterant in their
6   canned air product supplied to Walmart.
7   A.    Correct.
```

180.    At all material and relevant times and upon information and belief, certain retailers, such as Walmart, required Defendants to advertise the existence of a "bittering agent" on their Ultra Duster label in response to known incidents of dust remover abuse.

181.    However, at all material and relevant times, the "bittering agent" that Defendants advertised as an ingredient added to "discourage inhalant abuse," in fact, did not work for its intended or advertised purpose.

182.    Or worse, reasonable further investigation and discovery may show that Ultra Duster did not contain a bittering agent whatsoever.

183.    And upon information and belief, none of the Defendants conducted any testing or otherwise took any reasonable efforts to ensure the bittering agent they claim is present actually worked to deter or discourage abuse of the Ultra Duster product.

---

[115] Bussell Dep. 220:3–7, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

184.   According to Kennic Ho, AW Distributing did not even specifically request that Ultra Duster be tested to ensure a "bittering agent" was released from the product: [116]

```
20          What was your request -- specific request to
21   the testing company?
22          MR. WARING:  Object to form.
23          THE WITNESS:  To test inside the can, if there
24   is what I wanted inside.
25   BY MR. KOLTON:

1    Q.    So you tested to make sure that what you
2    wanted was inside the can, but you didn't specifically
3    ask them to test to make sure that it came out of the
4    can?
5          MR. WARING:  Object to form.
6          THE WITNESS:  I mean, if you're able to put it
7    inside, it got to be able to come outside.
```

185.   Similarly, according to Joe Bussell, Walmart did not require that Ultra Duster be tested to ensure a "bittering agent" was actually released from the product:[117]

```
7          Are you aware that Walmart did not require AWD to
8    demonstrate that bitterant actually comes out of the can?
9    A.    I'm not even aware how they would demonstrate that,
10   so, no, we wouldn't require that.
```

---

[116] Ho Dep. 114:20–7, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Feb. 15, 2016).
[117] Bussell Dep. 139:7–10, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

186.    In fact, according to Joe Bussell, Walmart had not seen any research or data that showed whether Ultra Duster released a "bittering agent" when Ultra Duster was sprayed:[118]

```
1   Q.   Well, have you seen the research or data that shows
2   that none of the bitterant comes out of the can when you
3   spray the product called Ultra Duster?
4            MR. WOOD:  Same objection.
5   A.   Related to --
6            MR. WARING:  Object to form.
7            MR. SANTIAGO:  Join.
8   A.   I have not seen that, no.
```

187.    Moreover, according to Joe Bussell, Walmart was not aware of any data that showed whether the "bittering agent" was even effective:[119]

```
3   So the question is yes or no.  Either you have seen data
4   research studies or something that indicates to you that
5   bitterant has some effect on the inhalation of canned air,
6   or you haven't.  And you've not seen any such study, have
7   you?
8            MR. WOOD:  Objection.  Move to strike.
9            MR. SANTIAGO:  Object to form.
10  A.   The answer is no, because I would have no reason to.
```

188.    At all material and relevant times, people continued to abuse Ultra Duster in order to get high despite the advertised "bittering agent," including Colten Treu.

189.    At all material and relevant times, Defendants knew or should have known that people continued to abuse Ultra Duster to get high, despite advertising to the public that Ultra Duster contained a bittering agent to help discourage inhalant abuse.

---

[118] Bussell Dep. 43:1–8, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

[119] Bussell Dep. 41:3–10, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

190.    According to Joe Bussell, Walmart was aware that people continued to abuse Ultra Duster despite the advertised "bittering agent" since at least 2012: [120]

```
 5          Walmart was well aware in 2012 after it had required
 6     a bitterant to be put in canned air products, that people
 7     continued to buy it and inhale it; right?
 8     A.    Walmart was aware that these incidents occurred.
 9     Q.    Continued to occur; right?
10     A.    Again, Walmart is aware that these incidents have
11     occurred.  As far as continuing to occur or how often they
12     do, I'm not sure what that is.
```

191.    According to Joe Bussell, Walmart was aware that people continued to abuse Ultra Duster in Walmart stores and Walmart parking lots: [121]

```
 3     Q.    (Mr. Cornwell continued.)  Walmart was also aware of
 4     hundreds of incidents involving individuals inhaling Ultra
 5     Duster on store property, in the store parking lot,
 6     driving vehicles, crashing cars, killing themselves, and
 7     killing others, in 2012, wasn't it?
 8              MR. WOOD:  Same objection.
 9     A.    Again, I don't know the specific nature of the
10     complaints.  Walmart was aware that there were incidents
11     involving people inhaling this product, and that's why
12     Walmart engaged with the suppliers to determine what sort
13     of action could be taken to deter that type of activity.
```

[120] Bussell Dep. 74:5–12, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).
[121] Bussell Dep. 54:3–13, *Grieco v. Merrill, et al.*, No. 50-2012-CA-021342-MB(AD), (Fla. Cir. Ct. Oct. 22, 2015).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

192.   At all material and relevant times, Defendants knew or should have known that the advertised "bittering agent" did not effectively discourage abuse of Ultra Duster as an inhalant.

193.   At all material and relevant times, and upon information and belief, Defendants refused to consider alternative deterrents to effectively discourage abuse of Ultra Duster as an inhalant. For example, Kennic Ho testified that AW Distributing did not want to pay to include an alternative deterrent in the Ultra Duster:[122]

```
19       Q.      Did AW Distributing ever distribute a version
20    of Ultra Duster that contained a pepperant instead of a
21    bitterant?
22              MR. WARING:  Object to form.
23              THE WITNESS:  No.
24    BY MR. KOLTON:
25       Q.      Why not?
```

---

[122] Ho Dep. 155:19–156:19, *Grieco v. Merrill,* No. 50-2012-CA-021342-MB(AD) (Fla. Cir. Ct. Feb. 15, 2016).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

156

```
 1     A.    A product -- the research and development
 2  process costs a lot of money, and if Daiho, they are not
 3  providing these expenses, it is possible probably just
 4  stopped doing developing and researching.
 5     Q.    So, if I'm understanding your answer
 6  correctly, it's because nobody wanted to pay for it?
 7           MR. WARING:  Object to the form.
 8           THE WITNESS:  If you understand it that way,
 9  yes.
10  BY MR. KOLTON:
11     Q.    Is that your understanding, that nobody wanted
12  to pay for the research and development, and that's why
13  the investigation in to a pepperant to replace the
14  bitterant didn't go any further?
15           MR. WARING:  Object to form.
16           THE WITNESS:  Usually, when developing a new
17  product, we have to evaluate if it's worth it or not.
18           If it's not worth it, usually it will just
19  stop.
```

194.    Even if Defendants successfully incorporated a "bittering agent" into Ultra Duster's formulation, the physiological effects of inhaling a "bittering agent" mixed with DFE could potentially cause bronchial smooth muscle relaxation, thereby increasing DFE absorption in the body and increasing Ultra Duster's intoxicating effects.[123]

---

[123] *See, e.g.,* Deshpande DA, Wang WCH, Mcilmoyle EL, Robinett KS, Schillinger RM, An SS, et al. *Bitter taste receptors on airway smooth muscle bronchodilate by localized calcium signaling and reverse obstruction.* NAT MED N Y (2010), 16:1299–304, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3066567/; Clifford RL, Knox AJ. *Future bronchodilator therapy: a bitter pill to swallow?* AM J PHYSIOL-LUNG CELL MOL PHYSIOL (2012), 303:L953–5, *available at* https://journals.physiology.org/doi/full/10.1152/ajplung.00303.2012; Liggett SB. *Bitter taste receptors on airway smooth muscle as targets for novel bronchodilators.* EXPERT OPIN THER

COMPLAINT

195.    At all material and relevant times, Ultra Duster was sold in quantities far greater than what would be expected if used only for its intended use.

196.    At all material and relevant times, Defendants knew or should have known that Ultra Duster was being sold in quantities far greater than what would be expected if used only for its intended use.

197.    At all material and relevant times, Defendants knew or should have known that Ultra Duster was being sold in quantities far greater than what would be expected if used only for its intended use because people were purchasing Ultra Duster to get high.

198.    At all material and relevant times, Defendants knew or should have known that a large portion of their sales of Ultra Duster were to people who purchased the product to get high.

199.    At all material and relevant times, Defendants knew or should have known that persons were using Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes.

200.    At all material and relevant times, Defendants placed Ultra Duster into the stream of commerce, despite knowledge of the foreseeable misuse of Ultra Duster as an inhalant, and that this foreseeable use would cause harm to innocent bystanders, including in motor vehicle crashes.

201.    At all material and relevant times, Defendants provided false and misleading warnings, labels, promotions, marketing, and information and failed to provide adequate warning of the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

202.    Reasonable further investigation and discovery may show that at all material and relevant times, Defendants falsely claimed that Ultra Duster contained a bittering agent that would deter inhalant abuse, when in fact Ultra Duster contained no such bittering agent.

---

TARGETS (2013), 17:721–31 *available at*
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4437536/.

COMPLAINT

203.     At all material and relevant times, Defendants falsely claimed that Ultra Duster contained a bittering agent that would deter inhalant abuse, when in fact the "bittering agent" was completely ineffective.

204.     At all material and relevant times, Defendants failed to add a "bittering agent" or other product to Ultra Duster that effectively deterred inhalant abuse.

205.     At all material and relevant times, people predictably and foreseeably continued to use Ultra Duster to get high, drive while high on Ultra Duster, lose control of their vehicles, and injure or kill innocent bystanders, including J.K., H.H., and Sara Schneider.

206.     At all times relevant, Defendants negligently, maliciously, wantonly, despicably, and willfully disregarded the rights and safety of the public, including J.K., H.H., and Sara Schneider, because they placed their dust remover products containing difluoroethane—such as Ultra Duster—into the stream of commerce, despite knowledge that people will continue to use Ultra Duster to get high, drive while high on Ultra Duster, lose control of their vehicles, and injure or kill innocent bystanders, including J.K., H.H., and Sara Schneider.

### J.K., H.H., AND SARA SCHNEIDER'S FATAL INJURIES

207.     On November 3, 2018, Colton R. Treu (hereinafter "Treu") was driving his vehicle in the Village of Lake Hallie, Chippewa County, Wisconsin.

208.     While driving, Treu and his passenger, John Stender, huffed a can of dust remover.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

209.    The dust remover that Treu inhaled and got high from was Defendants' Ultra Duster, which they purchased at a local Walmart store:

210.    Treu and his passenger both got high from intentionally huffing Ultra Duster.

211.    Treu and his passenger got high from huffing Ultra Duster despite the advertised presence of a bittering agent in the product.

212.    Treu lost consciousness and/or all control of his bodily movements when he was high on Ultra Duster.

213.    Treu lost the ability to drive and the ability to maintain control of his vehicle when he was high on Ultra Duster.

214.    Because Treu predictably and foreseeably huffed Ultra Duster, got high, lost consciousness and/or all control of his bodily movements, and lost the ability to maintain control of his vehicle, he predictably and foreseeably drove off the northbound lane of the highway, crossed the centerline, and crossed the southbound lane of the highway, where his vehicle struck J.K., H.H., and Sara Schneider, as well as additional members of their Girl Scout Troop 3055, all of whom were lawfully picking up trash on the side of the road, as part of the volunteer Adopt-a-Highway program.  The collision caused many deaths, including the deaths of J.K., H.H., and Sara Schneider.

215.    In an attempt by first responders to save J.K.'s life, J.K. was transported to Gillette Children's Specialty Healthcare hospital in St. Paul, Minnesota, where she was pronounced deceased. H.H. and Sara Schneider were pronounced deceased at the scene of the collision.

## FIRST CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

## Wrongful Death

216.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

217.    Plaintiffs Brian Kelley and Robin Kelley, Individually, and as Personal Representatives and General Co-Administrators of J.K.'s Estate, bring this wrongful death claim pursuant to Cal. Civ. Code § 377.60.

218.    Plaintiff J.O., Individually, and as Successor-in-Interest to the Estate of H.H., brings this wrongful death claim pursuant to Cal. Civ. Code § 377.60.

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

219. Plaintiff J.O., Individually, and as Successor-in-Interest to the Estate of Sara Schneider, brings this wrongful death pursuant to Cal. Civ. Code § 377.60.

220. The negligent and wrongful acts and omissions of Defendants as alleged herein had a substantial part in bringing about J.K., H.H., and Sara Schneider's deaths.

221. As a direct and proximate result of the negligent and wrongful acts of Defendants, Plaintiffs Brian Kelley, Robin Kelley, and J.O. claim damages for grief and mental anguish.

222. Plaintiffs Brian Kelley and Robin Kelley also claim damages for loss of the financial support and economic value that Decedent J.K. would have provided to her beneficiaries and Estate during her lifetime, including, but not limited to earnings, maintenance, support, inheritance and other similar losses that such beneficiaries would have received from J.K. for the rest of her natural life.

223. Plaintiffs Brian Kelley and Robin Kelley claim damages for all pecuniary losses suffered by J.K.'s beneficiaries and the pecuniary value of the anticipated services of J.K. to the survivors.

224. By reason of the foregoing, Plaintiffs Brian Kelley and Robin Kelley claim damages for J.K.'s past and future loss of consortium, services, society, support, guidance, tutelage, comfort and other similar losses.

225. Plaintiff J.O. also claims damages for loss of the financial support and economic value that H.H. would have provided to her beneficiaries and Estate during her lifetime, including, but not limited to earnings, maintenance, support, inheritance and other similar losses recognized, that such beneficiaries would have received from H.H. for the rest of her natural life.

226. Plaintiff J.O. also claims damages for loss of the financial support and economic value that Decedent Sara Schneider would have provided to her beneficiaries and Estate during her lifetime, including, but not limited to earnings, maintenance, support, inheritance and other similar losses that such beneficiaries would have received from Sara Schneider for the rest of her natural life.

227. Plaintiff J.O. claims damages for all pecuniary losses suffered by H.H.'s beneficiaries and the pecuniary value of the anticipated services of H.H. to the survivors.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

228.    Plaintiff J.O. claims damages for all pecuniary losses suffered by Sara Schneider's beneficiaries and the pecuniary value of the anticipated services of Sara Schneider to the survivors.

229.    By reason of the foregoing, Plaintiff J.O. claims damages for H.H.'s past and future loss of consortium, services, society, support, guidance, tutelage, comfort and other similar losses.

230.    By reason of the foregoing, Plaintiff J.O. claims damages for Sara Schneider's past and future loss of consortium, services, society, support, guidance, tutelage, comfort and other similar losses.

## SECOND CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

### Strict Products Liability – Defective Design

231.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

232.    At all material and relevant times, the Ultra Duster product at issue in this case was misused in a reasonably foreseeable manner.

233.    At all material and relevant times, J.K., H.H., and Sara Schneider's injuries and deaths were reasonably foreseeable.

234.    At all material and relevant times, J.K., H.H., and Sara Schneider's injuries and deaths were a reasonably foreseeable result of Ultra Duster's defective design.

235.    At all material and relevant times, safer, technologically feasible, and practical alternative designs were, have been, and are available to Defendants that would have prevented or substantially reduced the risk of J.K., H.H., and Sara Schneider's injuries and deaths and the resulting damages to their families, without rendering or substantially impairing the reasonably anticipated and/or intended function of Ultra Duster.

236.    At all material and relevant times, safer, technologically feasible, and practical alternative designs were, have been, and are available to Defendants that would have prevented J.K., H.H., and Sara Schneider's injuries and deaths, without rendering Ultra Duster too expensive for it to be reasonably marketable.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    237.   At all material and relevant times, the risk of harm caused by Ultra Duster's

2    defective design has outweighed and continues to outweigh its utility.

3    238.   At all material and relevant times, safer designs for Ultra Duster were available to

4    Defendants that were practicable, feasible, and/or otherwise reasonable alternative designs and/or

5    formulations that would have prevented or substantially reduced the risk of injury, harm, and death

6    to innocent bystanders in motor vehicle crashes.

7    239.   At all material and relevant times, safer, technologically feasible, and practical

8    alternative designs were, have been, and are available to Defendants that would have reduced and/or

9    prevented foreseeable misuse of Ultra Duster.

10   240.   Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to,

11   modifications in the packaging of Ultra Duster, including a modification so that less DFE can be

12   released during each spray.

13   241.   Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to,

14   modifications in the formulation, and/or amount, and/or inclusion altogether of the propellant, DFE,

15   found in Ultra Duster.

16   242.   Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to,

17   modifications in the formulation, and/or amount, and/or inclusion altogether of Ultra Duster's

18   "bittering agent."

19   243.   Reasonable, safer alternative designs of Ultra Duster, include, but are not limited to,

20   providing adequate warnings and instructions on the Ultra Duster product packaging.

21   244.   Multiple safer, feasible alternative designs of Ultra Duster were, have been, and are

22   available to Defendants, yet, Defendants have marketed and sold, and continues to market and sell,

23   Ultra Duster, a defectively designed and unreasonably dangerous product.

24   245.   At all material and relevant times, it was reasonably foreseeable that J.K., H.H., and

25   Sara Schneider could be killed as a result of the design defects of the Ultra Duster product at issue

26   in this case.

27

28

246.     The design defect or defects concerning the Ultra Duster product at issue in this case were a substantial, direct, and proximate cause of J.K., H.H., and Sara Schneider's injuries and deaths and the resulting damages to their families.

### THIRD CAUSE OF ACTION

### (As to All Plaintiffs and Defendants)

### Strict Products Liability –Manufacturing Defect

247.     Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

248.     At all material and relevant times, the Ultra Duster product at issue in this case was in substantially the same condition as it was when it left Defendants' control.

249.     At all material and relevant times, the Ultra Duster product at issue in this case was not altered in any way since the time it left Defendants' control.

250.     At all material and relevant times, the Ultra Duster product at issue in this case contained a manufacturing defect and was not reasonably fit, suitable or safe.

251.     At all material and relevant times, the Ultra Duster product at issue in this case deviated from the design specifications, formulae, and performance standards of Defendants' Ultra Duster.

252.     At all material and relevant times, the Ultra Duster product at issue in this case was manufactured differently than the same product as manufactured according to Defendants' manufacturing standards.

253.     At all material and relevant times, concerning the Ultra Duster product at issue in this case, any bittering agent that Defendants advertised as an ingredient added to Ultra Duster to discourage, deter, or prevent inhalant abuse, did not work for its intended or advertised purpose.

254.     At all material and relevant times, Defendants have advertised that their bittering agent, and/or formulation deter inhalant abuse. Because the Ultra Duster product at issue in this case was abused, a manufacturing defect apparently existed in the Ultra Duster product at issue in this case, as it was unable to deter abuse.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

255.   Reasonable further investigation and discovery may show that the Ultra Duster product at issue in this case did not contain a "bittering agent" whatsoever.

256.   Upon information and belief, reasonable investigation and discovery may show that some cans of Ultra Duster manufactured by Defendants contain a "bittering agent" and some cans do not, although Defendants' design specifications and performance standards mandate that all Ultra Duster cans contain a "bittering agent."

257.   Upon information and belief, reasonable investigation and discovery may show that, concerning the Ultra Duster product at issue in this case, the "bittering agent" did not uniformly mix with the DFE, and, thus, the "bittering agent" simply rested inside the can and did not escape the can along with DFE when the can was sprayed.

258.   At all material and relevant times, it was reasonably foreseeable that J.K., H.H., and Sara Schneider could be killed as a result of the manufacturing defect or defects of the Ultra Duster product at issue in this case.

259.   At all material and relevant times, the manufacturing defect or defects concerning the Ultra Duster product at issue in this case were a substantial, direct, and proximate cause of J.K., H.H., and Sara Schneider's injuries and deaths and the resulting damages to their families.

**FOURTH CAUSE OF ACTION**

**(As to All Plaintiffs and Defendants)**

**Strict Products Liability – Failure to Warn**

260.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

261.   At all material and relevant times, Defendants failed to provide an adequate warning on the Ultra Duster product at issue in this case.

262.   At all material and relevant times, Defendants knew or should have known that drivers impaired by inhaling Ultra Duster have injured bystanders in motor vehicle crashes.

263.   At all material and relevant times, Defendants knew or should have known that a driver misusing Ultra Duster could cause injury, harm, and/or death to innocent bystanders in motor vehicle crashes.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

264. At all material and relevant times, Defendants did not act as reasonably prudent manufacturers, distributors, or sellers because reasonably prudent manufacturers, distributors, and sellers would have kept reasonably familiar with news events and stories, scientific studies, and other reliable information concerning the foreseeable misuse of Ultra Duster while driving, which has caused injury, harm, and death to innocent bystanders in motor vehicle crashes, and reasonably prudent manufacturers, distributors, and sellers would have enhanced a product's warning based on this information.

265. At all material and relevant times, Defendants provided false and misleading warnings, labels, promotions, marketing, and information about the deterrent effect of Ultra Duster's "bittering agent."

266. At all material and relevant times, Defendants did not provide any warning on the Ultra Duster product at issue in this case concerning the risks and dangers associated with the foreseeable misuse of Ultra Duster, including, the risks and dangers of causing injury, harm, and/or death to innocent bystanders in motor vehicle crashes.

267. At all material and relevant times, Defendants failed to provide adequate warnings and/or instructions to others in the chain of distribution about the risks and dangers associated with the foreseeable misuse of Ultra Duster, including the risks and dangers of causing injury, harm, and death to innocent bystanders in motor vehicle crashes.

268. At all material and relevant times, Defendants failed to provide adequate warnings and/or instructions about the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but might injure innocent bystanders in motor vehicle crashes. Defendants failed to convey this information to distributors and/or retailers of Ultra Duster, as well as to foreseeable misusers of Ultra Duster, regulatory authorities, law enforcement authorities, legislative authorities, news organizations, and/or any other relevant service or organization that could implement restrictions concerning the improper use and/or sale of Ultra Duster.

269. At all material and relevant times, had Defendants provided adequate warnings or instructions about the risks and dangers associated with the foreseeable misuse of Ultra Duster,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    including warnings concerning the risks and dangers of causing injury, harm, and/or death to

2    innocent bystanders in motor vehicle crashes, that warning would have been heeded by the Ultra

3    Duster misuser or misusers involved in the motor vehicle crash that killed J.K., H.H., and Sara

4    Schneider.

5        270.    At all material and relevant times, Defendants' failure to provide adequate warnings

6    to others in the chain of distribution and the foreseeable misuser of the Ultra Duster product at issue

7    in this case was a substantial, direct, and proximate cause of J.K., H.H., and Sara Schneider's

8    injuries and deaths and the resulting damages to their families.

9                        **FIFTH CAUSE OF ACTION**

10                   **(As to All Plaintiffs and Defendants)**

11                           **Negligence**

12       271.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation

13   contained in the previous paragraphs as if fully set forth herein at length.

14       272.    At all material and relevant times, Defendants had a duty to exercise reasonable care

15   in the design, research, formulation, manufacture, production, marketing, testing, supply,

16   promotion, packaging, sale, distribution and/or monitoring of Ultra Duster, including, a duty to

17   assure that the product would not cause foreseeable injuries and deaths through foreseeable misuse.

18       273.    At all material and relevant times, Defendants owed a duty to exercise reasonable

19   care in providing reasonable and adequate warnings of the risks and dangers associated with the

20   foreseeable misuses of Ultra Duster, including the risk and danger of injury, harm, and death to

21   innocent bystanders, such as J.K., H.H., and Sara Schneider, caused by the foreseeable misuse of

22   Ultra Duster as an inhalant while driving.

23       274.    At all material and relevant times, Defendants breached their duty when they failed

24   to exercise reasonable care in the designing, testing, producing, processing, assembling,

25   formulating, inspecting, researching, promoting, labeling, marketing, advertising, distributing, and

26   selling of Ultra Duster in that they:

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

a.    Failed to use due care in the designing, manufacturing, and/or distributing of Ultra Duster to avoid the foreseeable risk of injury, harm, and death to innocent bystanders caused by the foreseeable misuse of Ultra Duster as an inhalant while driving.

b.    Failed to use due care in providing reasonable and adequate warnings of the risks and dangers associated with the foreseeable misuses of Ultra Duster, including the risk and danger of injury, harm, and death to innocent bystanders caused by the foreseeable misuse of Ultra Duster as an inhalant while driving.

275.    As a direct and proximate result of Defendants' carelessness, negligence, and of their design, manufacture, sale and distribution of an unreasonably dangerous product, J.K., H.H., Sara Schneider were killed and they and their families have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein.

## SIXTH CAUSE OF ACTION

### (As To All Plaintiffs and Defendants)

### Breach of Express Warranty

276.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

277.    At all material and relevant times, Defendants expressly warranted to others in the chain of distribution and end-users that Ultra Duster was safe, of merchantable quality, and adequately fit for use.

278.    At all material and relevant times, Defendants made these warranties through their website, product labeling, product descriptions, and promises, including  written and verbal assurances of safety, that was intended to create a demand for Ultra Duster.

279.    At all material and relevant times, Defendants breached various express warranties, including that Ultra Duster contained a "bitterant to help discourage inhalant abuse," and made the "contents [of Ultra Duster] extremely unpleasant to inhale."

280.    At all material and relevant times, Ultra Duster did not conform to Defendants' express warranties because it contained a manufacturing defect and was not reasonably fit, suitable or safe.  The "bittering agent" that Defendants advertised as an ingredient added to Ultra Duster to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

deter "inhalant abuse," in fact, did not work for its intended or advertised purpose. Defendants failed to design and manufacture Ultra Duster in a manner such that the "bittering agent" or another product effectively deterred inhalant abuse, so as to avoid the foreseeable risk of injury, harm, and death to innocent bystanders in motor vehicle crashes.

281.    At all material and relevant times, Ultra Duster did not conform to Defendants' express warranties because it was defective in design or formulation in that, when it left the hands of Defendants, it was in an unreasonably dangerous and defective condition as designed, and posed a foreseeable risk of injury, harm, and death to innocent bystanders in motor vehicle crashes.

282.    At all material and relevant times, people and others in the product's chain of distribution predictably and foreseeably relied on Defendants' express warranties, which became a basis of the bargain of the purchase of the Ultra Duster that is the subject of this Complaint.

283.    At all material and relevant times, people predictably and foreseeably continued to use Ultra Duster to get high, drive while high on Ultra Duster, lose control of their vehicles, and injure or kill innocent bystanders, including J.K., H.H., and Sara Schneider.

284.    J.K., H.H., Sara Schneider, consumers, and the public could not have discovered the breached warranties and realized Ultra Duster's danger.

285.    At all material and relevant times, Defendants breached their express warranties, including under Cal. Comm. Code. § 2313, because Ultra Duster was not safe, of merchantable quality, or adequately fit for use.

286.    As a direct and proximate result of Defendants' actions, omissions, and misrepresentations, J.K., H.H., Sara Schneider, and their families have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein. Defendants' misconduct was a substantial factor in causing Plaintiffs harm.

## SEVENTH CAUSE OF ACTION

### (As To All Plaintiffs and Defendants)

### Breach of Implied Warranty

287.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

288.    At all material and relevant times, Defendants designed, manufactured, distributed, advertised, promoted, and sold Ultra Duster.

289.    At all material and relevant times, Defendants impliedly warranted that Ultra Duster was safe, of merchantable quality, and adequately fit for foreseeable use.

290.    At all material and relevant times, Defendants were aware that consumers, including Treu, would intentionally inhale the Ultra Duster for its intoxicating effects while driving.

291.    At all material and relevant times, consumers and the public, including J.K., H.H., Sara Schneider, and Treu reasonably relied upon the judgment and sensibility of Defendants to sell Ultra Duster only if it was indeed of merchantable quality and safe and fit for its foreseeable uses.

292.    At all material and relevant times, Defendants breached their implied warranties, including pursuant to Cal. Comm. Code. §§ 2314–2315, to consumers and the public, including J.K., H.H., Sara Schneider, and Treu, because the Ultra Duster was not of merchantable quality or safe and fit for its intended use.

293.    At all material and relevant times, Defendants' Ultra Duster product was not of the same quality as those generally acceptable in the trade, was not fit for the ordinary purposes for which the Ultra Duster is used, was not adequately contained, packaged, and labeled, and did not measure up to the promises or facts stated on the product's container or label.

294.    At all material and relevant times, consumers and the public, including J.K., H.H., and Sara Schneider, by the use of reasonable care, would not have discovered the breached warranty and realized Ultra Duster's danger.

295.    As a direct and proximate result of Defendants' actions, omissions, and misrepresentations, J.K., H.H., and Sara Schneider and their families have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein.  Defendants' misconduct was a substantial factor in causing Plaintiffs harm.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**EIGHTH CAUSE OF ACTION**

**(As To All Plaintiffs and Defendants)**

**Unfair Business Practices**

296.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

297.    Plaintiffs bring these claims pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.*, which prohibits unfair, unlawful and fraudulent business practices.

298.    At all material and relevant times, and as more fully described herein, Defendants provided false, unfair, deceptive, untrue, and misleading warnings, labels, promotions, marketing, and information about the deterrent effect of Ultra Duster's "bittering agent" and the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

299.    At all material and relevant times, and as described thoroughly herein, Defendants knew that it was reasonably foreseeable that users would intentionally inhale their Ultra Duster product and cause harm to innocent bystanders and themselves. Despite this knowledge, Defendants failed to take reasonable and necessary precautions against that foreseeable misuse and resulting foreseeable harm.  And in fact, Defendants inserted a bittering agent into the Dust-Off product for the advertised purpose of preventing and deterring a user from intentionally inhaling the product, despite knowing that the bittering agent was not effective for that advertised purpose or despite not having even determined whether the bittering agent was in fact effective for that advertised purpose.  Defendants misled consumers and the general public about the safety of its Ultra Duster products.

300.    The Defendants' misconduct outlined in this Complaint constitutes unfair, unlawful and fraudulent business practices.  As a direct and proximate result of Defendants' misconduct, J.K., H.H., Sara Schneider, and their families have suffered, and in the future will suffer injury in fact, as more fully described herein.

301.    The Defendants' misconduct is ongoing and continuing.  As such, Plaintiffs seek injunctive relief under Cal. Bus. & Prof. Code § 17203, as set forth in Plaintiffs' prayer for relief.

1

## NINTH CAUSE OF ACTION

2

### (As To All Plaintiffs and Defendants)

3

### False Advertising

4

302.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation

5

contained in the previous paragraphs as if fully set forth herein at length.

6

303.    Plaintiffs bring these claims pursuant to Cal. Bus. & Prof. Code § 17500 *et seq.*,

7

which prohibits deceptive, false and/or misleading advertising.

8

304.    At all material and relevant times, Defendants knew or should have known that

9

people were using Ultra Duster in a manner that resulted in death and injury to innocent bystanders

10

in motor vehicle crashes.

11

305.    At all material and relevant times, Defendants placed Ultra Duster into the stream

12

of commerce despite knowledge of the foreseeable misuse of Ultra Duster as an inhalant, and that

13

this foreseeable use would cause harm to innocent bystanders, including in motor vehicle crashes.

14

306.    At all material and relevant times, Defendants provided false, unfair, deceptive,

15

untrue, and misleading advertisements, warnings, labels, promotions, marketing, and information

16

about the deterrent effect of Ultra Duster's "bittering agent," and the risks and dangers associated

17

with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra

18

Duster, but innocent bystanders in motor vehicle crashes as well.

19

307.    At all material and relevant times, and as described thoroughly herein, Defendants

20

knew that it was reasonably foreseeable that users would intentionally inhale their Ultra Duster

21

product and cause harm to innocent bystanders and themselves. Despite this knowledge,

22

Defendants failed to take reasonable and necessary precautions against that foreseeable misuse and

23

resulting foreseeable harm.  And in fact, Defendants inserted a bittering agent into the Dust-Off

24

product for the advertised purpose of preventing and deterring a user from intentionally inhaling

25

the product, despite knowing that the bittering agent was not effective for that advertised purpose

26

or despite not having even determined whether the bittering agent was in fact effective for that

27

advertised purpose.  Defendants misled consumers and the general public about the safety of its

28

Ultra Duster products.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

308.   As a direct and proximate result of Defendants' misconduct, J.K., H.H., Sara Schneider and their families have suffered, and in the future will suffer injury in fact, as more fully described herein.

309.   The Defendants' misconduct is ongoing and continuing.  As such, Plaintiffs seek injunctive relief under Cal. Bus. & Prof. Code § 17535.

## **TENTH CAUSE OF ACTION**

### **(As To All Plaintiffs and Defendants)**

### **Public Nuisance**

310.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

311.   Plaintiffs bring these claims pursuant to Cal. Civ. Code §§ 3479–80.

312.   At all material and relevant times, Defendants knew or should have known that people continued to abuse Ultra Duster in order to get high despite the advertised "bittering agent."

313.   At all material and relevant times, Defendants knew or should have known that people were using Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes.

314.   At all material and relevant times, Defendants engaged in deceptive, unconscionable, unfair and misleading commercial practices in the marketing and sale of Ultra Duster that Defendants knew to be defective.

315.   At all material and relevant times, Defendants provided false and misleading warnings, labels, promotions, marketing, and information about the risks and dangers associated with the foreseeable misuse of Ultra Duster that might befall not just the person inhaling Ultra Duster, but innocent bystanders in motor vehicle crashes as well.

316.   At all material and relevant times, Defendants induced people to use Ultra Duster in a manner that resulted in death and injury to innocent bystanders in motor vehicle crashes, with the intent that people rely thereon in connection with the sale or advertisement of Ultra Duster through the use of deception, fraud, false advertising, false pretenses, misrepresentations, unfair and/or

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   deceptive practices and the concealment and suppression of material facts, including but not limited

2   to fraudulent statements, concealments and misrepresentations identified herein and above.

3   317.   At all material and relevant times, Defendants' actions and omissions have created

4   a public nuisance.  Defendants' carelessness, negligence, recklessness, deception, and concealment

5   constitutes an unreasonable interference with the exercise of the common rights of the health,

6   safety, and welfare to the general public, and has maintained or permitted a condition which

7   unreasonably endangers the safety and health of the members of the general public, including, but

8   not limited to innocent bystanders in motor vehicle crashes.

9   318.   Defendants' failure to inform the public about the risks and dangers associated with

10   the foreseeable misuse of Ultra Duster, and failure to disclose that Ultra Duster lacked the "bittering

11   agent" to deter inhalant abuse, has prevented the public from knowing of a real danger, and has

12   thereby endangered the safety and health of the members of the general public by allowing more

13   people to continue to inhale and abuse Ultra Duster, resulting in an increased risk and danger of

14   injury, harm, and death to innocent bystanders in motor vehicle crashes.

15   319.   Defendants' carelessness, negligence, recklessness, deception, and concealment is

16   of a constant and continuing nature.  Defendants' actions and omissions will undoubtedly continue

17   to cause long-lasting effects on members of the general public, including, but not limited to

18   innocent bystanders in motor vehicle crashes.

19   320.   Defendants' carelessness, negligence, recklessness, deception, and concealment was

20   specially injurious to J.K.'s, H.H.'s, Sara Schneider's health and personal enjoyment of life as J.K.,

21   H.H., and Sara Schneider were killed by a driver who inhaled and abused Ultra Duster.

22   321.   Defendants' carelessness, negligence, recklessness, deception, and concealment was

23   specially injurious to the Plaintiffs and their personal enjoyment of life in that when the Plaintiffs

24   finally discovered Defendants' carelessness, negligence, recklessness, deception, and concealment,

25   the Plaintiffs experienced mental and emotional anguish because their loved ones, J.K., H.H., and

26   Sara Schneider, had been the victims of Defendants' carelessness, negligence, recklessness,

27   deception, and concealment.  The Plaintiffs continue to experience mental and emotional anguish

28   because they fear that Defendants' carelessness, negligence, recklessness, deception, and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

concealment will continue to harm and kill other innocent bystanders in California, Wisconsin, and throughout the United States.

322.    At all material and relevant times, the foreseeable risks of injury, harm, and death to innocent bystanders in motor vehicle crashes due to Ultra Duster far outweighed the benefits associated with Ultra Duster.

323.    Defendants' design, manufacture, marketing, distribution, and sale of Ultra Duster, if unabated, will continue to cause an unreasonable interference with public rights of the members of the general public, including, but not limited to innocent bystanders in motor vehicle crashes.

324.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, deception, and concealment, and of their design, manufacture, distribution, and sale of an unreasonably dangerous product, J.K., H.H., Sara Schneider, their families, and the general public have suffered, and in the future will suffer permanent and substantial losses, harms and damages, as more fully described herein.

## ELEVENTH CAUSE OF ACTION

### (As to Plaintiffs Brian Kelley, Robin Kelley, and J.O. and All Defendants)

### Survival Action

325.    Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

326.    Plaintiffs Brian Kelley and Robin Kelley, as General Co-Administrators of the Estate of J.K., bring this claim pursuant to Cal. Civ. Code § 377.30.

327.    By reason of the foregoing, and, as a direct and proximate result of Defendants' conduct, J.K. suffered damages, including, but not limited to, bodily injury, severe physical pain and mental anguish and suffering, loss of capacity of the enjoyment of life, shortened life expectancy, loss of life, fear and anxiety, expense of hospitalization, medical treatment, and associated costs, funeral and burial expenses, and other damages prior to J.K.'s death.

328.    By reason of the foregoing, Plaintiffs Brian Kelley and Robin Kelley claim damages compensable against Defendants.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

329.   By reason of the foregoing, Plaintiffs Brian Kelley and Robin Kelley, Personal Representatives and General Co-Administrators of the Estate of Decedent J.K., claim damages compensable against Defendants.

330.   Plaintiff J.O. as Successor-in-Interest to the Estate of H.H. and as Successor-in-Interest to the Estate of Sara Schneider, bring these claims pursuant to Cal. Civ. Code § 377.30.

331.   By reason of the foregoing, and, as a direct and proximate result of Defendants' conduct, H.H. suffered damages, including, but not limited to, bodily injury, severe physical pain and mental anguish and suffering, loss of capacity of the enjoyment of life, shortened life expectancy, loss of life, fear and anxiety, expense of hospitalization, medical treatment, and associated costs, funeral and burial expenses, and other damages prior to H.H.'s death.

332.   By reason of the foregoing, and, as a direct and proximate result of Defendants' conduct, Sara Schneider suffered damages, including, but not limited to, bodily injury, severe physical pain and mental anguish and suffering, loss of capacity of the enjoyment of life, shortened life expectancy, loss of life, fear and anxiety, expense of hospitalization, medical treatment, and associated costs, funeral and burial expenses, and other damages prior to Sara Schneider's death.

333.   By reason of the foregoing, Plaintiff J.O. claims damages compensable against Defendants.

334.   By reason of the foregoing, Plaintiff J.O. as Successor-in-Interest to the Estates of H.H. and Sara Schneider, claims damages compensable against Defendants.

## TWELFTH CAUSE OF ACTION

**(As to Plaintiffs Robin Kelley and Brian Kelley and All Defendants)**

**Negligent Infliction of Emotional Distress**

335.   Plaintiffs repeat, reiterate, re-allege and incorporate by reference every allegation contained in the previous paragraphs as if fully set forth herein at length.

336.   Plaintiff Robin Kelley was present during and witnessed Decedent J.K.'s fatal injuries on November 3, 2018.

COMPLAINT

337.    As a result of witnessing the tragic and fatal injury of J.K., her nine-year-old child, Plaintiff Robin Kelley has suffered and continues to suffer shock and severe emotional distress and/or physical distress and mental anguish.

338.    As a result of witnessing unsuccessful attempts by both Brian Kelley and paramedics to revive J.K., Plaintiff Robin Kelley has suffered and continues to suffer shock and severe emotional distress and/or physical distress and mental anguish.

339.    As a result of being in the zone of danger when Decedent J.K. was struck by a vehicle, Plaintiff Robin Kelley has suffered and continues to suffer shock and severe emotional distress and/or physical distress and mental anguish.

340.    As a direct and proximate result of Defendants' conduct, acts and/or omissions, Plaintiff Robin Kelley has suffered and continues to suffer severe emotional and/or physical distress and mental anguish, and continues to suffer ongoing damages.

341.    Plaintiff Brian Kelley was present during and witnessed Decedent J.K.'s fatal injuries on November 3, 2018.

342.    As a result of witnessing the tragic and fatal injury of J.K., his nine-year-old child, Plaintiff Brian Kelley has suffered and continues to suffer shock and severe emotional distress and/or physical distress and mental anguish.

343.    As a result of attempting to revive J.K. himself, as well as from witnessing unsuccessful attempts by paramedics to revive J.K., Plaintiff Brian Kelley has suffered and continues to suffer shock and severe emotional distress and/or physical distress and mental anguish.

344.    As a result of being in the zone of danger when Decedent J.K. was struck by a vehicle, Plaintiff Brian Kelley has suffered and continues to suffer shock and severe emotional distress and/or physical distress and mental anguish.

345.    As a direct and proximate result of Defendants' conduct, acts and/or omissions, Plaintiff Brian Kelley has suffered and continues to suffer severe emotional and/or physical distress and mental anguish, and continues to suffer ongoing damages.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

### PRAYER FOR RELIEF

2       **WHEREFORE,** Plaintiffs, BRIAN KELLEY and ROBIN KELLEY, Individually, and as

3   Personal Representatives and General Co-Administrators of THE ESTATE OF J.K., their minor

4   child, deceased; and Plaintiff, J.O., a minor, Individually, and as Successor-in-Interest to THE

5   ESTATE OF H.H., deceased, and as Successor-in-Interest to THE ESTATE OF SARA

6   SCHNEIDER, deceased, by and through his Guardian ad Litem, JUDY SCHNEIDER, pray for

7   judgment against Defendants for their wrongful, malicious, oppressive, and fraudulent conduct, all

8   as described herein, as follows:

9       1.      Awarding Plaintiffs damages against Defendants in an amount reasonably in excess

10              of Seventy-Five Thousand Dollars ($75,000.00);

11      2.      For injunctive relief:

12              a.      prohibiting the sale of dusting sprays designed, manufactured, distributed

13                      and sold by Defendants containing difluoroethane to minors;

14              b.      prohibiting the sale of more than one can of dusting spray designed,

15                      manufactured, distributed, and sold by Defendants containing

16                      difluoroethane per consumer within a 30-day period of time;

17              c.      prohibiting Defendants from designing, manufacturing, distributing, and

18                      selling dusting sprays containing difluoroethane without an effective

19                      physical mechanism or chemical composition to deter inhalant abuse.

20      3.      Ordering an abatement of the ongoing public nuisance conditions caused by Ultra

21              Duster;

22      4.      Awarding Plaintiffs pre-judgment and post-judgment interest;

23      5.      Awarding Plaintiffs their reasonable costs and disbursements;

24      6.      Awarding Plaintiffs punitive damages;

25      7.      Awarding Plaintiffs costs of investigation and reasonable attorney's fees;

26      8.      Awarding such additional relief as the Court may deem just and equitable.

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

DATED:  October 5, 2020

**ROBINS KAPLAN LLP**

By: ___/s/ David Martinez_____

David Martinez, State Bar No. 193183
Tara Sutton (*pro hac vice* to be submitted)
Gary Wilson, State Bar No. 139358
Philip Sieff (*pro hac vice* to be submitted)
Jason DePauw (*pro hac vice* to be submitted)
Rashanda Bruce (*pro hac vice* to be submitted)

Attorneys for Plaintiffs

- 67 -

COMPLAINT